UNITED STATES DISTRICT COURT

FOR THE FIRST CIRCUIT

| | |
|---|---|
| JOHN CASSIDY<br>PLAINTIFF | ) |
| V. | ) |
| ATTORNEY GENERAL MAURA HEALEY,<br>COMMONWEALTH OF MASSACHUSETTS<br>DEFENDANT | ) |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff John Cassidy moves, in accord with Fed.R.Civ.P.56, for summary judgment. The accompanying statement of material facts, along with the Fall River Superior Court trial transcripts for John Cassidy's trial makes plain The Commonwealth violated his civil rights and presents the following issues of law that can and indeed should be resolved on summary judgment:

(I) Did The Commonwealth sustain their burden of proving 'knowingly possession' of devices and firearms to convict Mr. Cassidy;

(II) Did The Commonwealth violate Mr. Cassidy's due process rights by failing to provide adequate and substantial notice of statutes and rosters charging him with said crimes, and further violated Mr.Cassidy's rights by violating the Priveleges and Immunities Clause of The Constitution and the void for vagueness doctrine;

(III) Did The Commonwealth violate Mr. Cassidy's civil right to own and bear arms inside his home as a U.S. citizen; and

(IV) Has The Commonwealth wrongly interpeted its' own Constitution, specifically art. 17, the right to bear arms by ruling art. 17 confers a 'collective right,' thereby denying Mr. Cassidy of his civil right to bear arms as a resident of Massachusetts. Denying him his natural and individual right to own and possess firearms within his home.

For the reasons set forth below, the response to (I) is NO, while (II), (III), and (IV) is affirmatively YES, as a matter of law. The Commonwealth prevails on none of the above questions of law; Mr. Cassidy's motion for summary judgment should be granted.

## A. BACKGROUND

John Cassidy moved to Massachusetts to attend law school in August 2010. March 2, 2011 he was jailed in Bristol County after

a valid search warrant for his apartment was executed by The Dartmouth Police. On March 10, 2015 Mr. Cassidy was found guilty of seven felony gun possession charges stemming from his apartment search conducted on 3/2/11. On March 3rd, 2015 Mr. Cassidy was sentenced to two and one half mandatory years in a state jail. He is currently serving his prison sentence. Certainly these seven felony convictions are in violation of John Cassidy's Second Amendment rights under the U.S. Constition at the Minimum, as made clear in Heller and McDonald. Any attempt by this Commonwealth to modify, abridge, or usurp his rights secured to him by The U.S. Constition and the above rulings based upon McGowan, Runyan, Powell ultimately fail. This citizen's firearms, munitions, and/or devices were purchased through wholly legal conduct under Federal and Texas law. This citizen moved to Massachusetts to attend graduate school, bringing with him his possessions which included his legal firearms. The firearms in question were kept inside his home, had legible, tracable, verified serial numbers. Mr. Cassidy now finds himself a seven time convicted felon sentenced to 2.5 years in a state jail for his in home possesson. The Commonwealth will likely seek to support these convictions by such cases as Depina, Davis, and Jackson, however there is nothing 'reasonable' about firearms regulations that punish prior legal conduct or punish continued exercise/ownership of said items due to a change in state law unknown to John. Heller and McDonald make clear that 'reasonable regulations' or longstanding prohitions are permitted, yet treating a new resident as a criminal for in home possession of firearms and imprisonment is not what The U.S. Supreme Court had in its mind when selectively incorporating The Second Amendment and applying this right to all fifty states. Nor does the punishment fit the crime, said items could be owned by John had The Commonwealth allowed this new resident to pay the taxes and file the proper paperwork. 'Reasonable' allowances when one considers the alternative route; which is the path The Commonwealth took. Including state jail time, seven felony convictions, and four years of pending criminal proceedings are certainly unreasonable. Had John been allowed to apply and pay taxes but been denied he would have had a grace period to surrender the arms and an appeal of his denial, which would of certainly saved this

unreasonable outcome from being labeled as such. Unfortunately an over-zealous District Attorney's Office or a too rigid and rescrtictive firearm reglatory scheme did not permit such a reasonable outcome, instead prosecution and imprisonment were the paths taken.

A new resident to the Commonwealth should not be treated as an unwelcomed guest under The Priveleges and Immunities Clause. John's firearm illegalities could have swiftly and justly been resolved had the District Attorney's Office shown restraint rather than contempt for private citizen's ownerships of firearms. Mr. Cassidy could have been asked to reliqunish the arms or face charges. Mr. Cassidy could have been asked to prove lawful ownership/purchase or face charges. Mr. Cassidy could have temporaily been in custody or arms temporaily confiscated until a proper permit issued to him. Mr. Cassidy could of legally transferred the arms to another private citizen in or out of state. Or Mr. Cassidy could have been given a grace period to own the arms while his firearms application was pending. Post Heller and McDonald all these possibilities would have been well within the law and not violations of his civil rights, and very much 'reasonable.' However, the state chose pending criminal charges culminating in a state jail sentence. Not only depriving this young man of his course in law school, but seemingly endless collateral damage to his life, reputation, physical and mental health of him and his family.

## B. STANDARD OF REVIEW

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp. 475 U.S. 574, 587 (1986); Boazova v. Safety Ins. Co., 462 Mass. 346, 350 (2012). A fact is material if it has the potential to affect the outcome of the litigation "under the governing law." Anderson v. Liberty Lobby, Inc., 447 U.S. 242, 248 (1986). In the absence of disputed supporting facts, summary judgment is warranted. FN1

---

FN1: Plaintiff states there are no genuine issues of disputed material facts in this case. Mass.R.Civ.P.56, 1973 Rep. Note ("Trials are necessary only to resolve issues of fact; if at any time the court is made aware of the total absence of such issues; it should on motion promptly adjudicate the legal

## C. ARGUMENT

Respect for the printed word is an essential componemnt of the impartial and effective delivery of justice. Courts are normally called upon to interpet the meaning of words as used by legislatures, executives, other judges or private citizens. This case at bar is no different. In the following pages such words as 'knowingly,' 'common defence,' and 'right to bear arms' will be discussed and analyzed. Ultimately, the question or issue presented will be if The Commonwealth has taken away freedoms , liberties, and rights of John Cassidy because he chose to exercise his right to possess, own and bear arms as a citizen of The United States of America. That is, by way of imprisonment via felony convictions for possessory firearm offenses, turning John into a felon. A class of people entirely acceptable to be stripped of their gun rights. These felonious convictions coming by way of in home possession with the illegality stemming from lack of a Massachusetts' state license.

Clearly a miscarriage of justice has occurred. If the U.S. Supreme Court makes anything perfectly clear in Heller and McDonald it is the right to own weapons inside one's home is at the core of The Second Amendment and a natural right. However The Commonwealth has perverted these rulings under the guise of 'reasonable' regulations by imprisoning a young man from Texas, who is attending graduate school here in Massachusetts, for owning firearms he lawfully purchased in Texas and continued to own after moving to Massachusetts in 2010. The firearms in questions could have been owned in Massachusetts had this Plaintiff been aware of the licensing requirement for in home possession pre-arrest or had he been allowed to apply post-arrest to avoid any criminality. The fact that the judiciary system failed him or an over-zealous District Attorney's Office sought imprisonment over reasonableness is far from justice. The very real and reasonable outcomes for this young Man beyond indictment and mandatory jail time in a state jail were multiple and readily available, yet overlooked and disregarded.

---

FN1: questions which remain and thus terminate the case."

**I. The word 'knowingly' is used in the firearm's statutes. The Commonwealth cannot/didn't meet its burden of (1)proving sufficient knowledge of the licensing scheme and (2)further knowledge of the offending characteristics of the firearms bringing said firearms into a subcategory within the reglatory scheme. With any ambiguity or uncertainity in the reglatory scheme being resolved in favor of John Cassidy by invoking the Rule of Lenity.**

John Cassidy is convicted of four counts of knowingly possessing a large capacity feeding device, M.G.L. c. 269 §10(m), one count of knowingly possessing a large capacity firearm , M.G.L. c. 269 §10(m) and one count of knowingly possessing an assault weapon, M.G.L. c. 140 § 131M. One element of the offense is that the accused 'knowingly' possessed the firearm or device. This Plaintiff noting the offending characteristic of said devices being "Large Capacity." This characteristic is unique to Massachusetts firearm's licensing scheme as compared to the lionshare of other states' licensing schemes. Moreover, Mr. Cassidy's inhome possession of said firearms would have been an affirmative defense had the offending characteristics of 'large capacity' not been a secondary designation of the firearms /devices as defined by Massachusetts statutes. See c. 140 §121. That is the primary designation being handgun, firearm or pistol and secondary as a 'large capacity device/firearm.'

MENS REA

"A fundamental tenet of criminal law is that culpability requires a showing that the prohibited conduct (actus rea) was committed with the concomitant mental state (mens rea) prescribed for the offense." Commonwealth v. Lopez, 433 Mass. 722, 725 (2001). "There can be no crime, large or small, without a wicked mind. In other words, punishment is the sequence of wickedness. Neither in philosopical speculation, nor in religious or moral sentiment, would any people in any age allow that a man be deemed guility unless his mind was so." J. Bishop , New Criminal Law 192 (9th ed. 1923). "The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of

the human will and consequent ability and duty of the normal individual to choose between good and evil. Morissette v. United States, 342 U.S. 246, 250 (1952). See Dennis v. U.S., 341 U.S. 393, 500(1951)(stating the existance of mens rea is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence).

Actus non facit reum nisi mens sit rea, without a guilty mind, there is no crime. In United States v. Balint, 258 U.S. 250, 251(1922), the court stated that "the general rule at common law was that scienter was a necessary element in the indictment and proof of every crime..." Furthermore, strict liabilty crimes are the exception, not the rule, and mens rea will not be read out of a statute without the express intent of Congress. United States Gypsum Co., 438 U.S. 422, 436 (1978). "Criminal liability is normally based upon the concurrence of two factors, 'an evil meaning and an evil doing hand...'" U.S. v. Clifford Bailey, 444 U.S. 394 (1980)citing Morisette at 244. "Few areas of criminal law pose more difficulty than the proper definition of mens rea required for any particular crime." Bailey at 403. The court noted the movement away from traditional dichotomy of intent and toward an alternative analysis of mens rea. Id. quoting W.Leave and A.Scott Handbook on Criminal Law §28 p 201-202 (1972). This new approach, exemplified in American Law Institute's Model Penal Code, is based upon two principles. Ambiguous elastic intent is replaced with a hierarchy of culpable states of mind. The different levels in descending orders of culpability are purpose, knowledge, recklessness and negligence. Noting that perhaps the most significant distinction drawn by this analysis is that between mental states of 'purpose' and 'knowledge.' As pointed out in U.S. v. U.S. Gypsum Co., a person who causes a particular result is said to act purposefully if "he consciously desires that result, whatever the liklihood of result happening from his conduct, while he is said to act knowingly if he is aware that that result is practically certain to follow his conduct, whatever his desire may be as to that result." Gypsum at 445. This hierarchy does not attempt to cover those offenses where criminal liability is imposed in the absence of any mens rea whatsoever. Such strict liability crimes are exceptions to the general rule that criminal liability requires an 'evil meaning mind.' Under the Model Penal Code, the only offenses based on strict liability are 'violations,'

actions punishable by a fine, forfeiture, or other civil penalty rather than imprisonment. See MPC §2.05(1)(a). Bailey, 444 U.S. 394 at 404 n.4.

STATUTE CONSTRUCTION AND INTREPRETATION

In construing statues, courts should presume, absent contrary evidence that Congress knew, and meant to adopt, the background legal concepts associated with the words that it chose to incorporate into law. Morissette at 263; Greenwood Trust Co. v. Massachusetts, 971 F.2d 818, 827(1st Cir. 1992). These principles of construing statues were recently reaffirmed in United States v. Coccia, 446 F.3d 233(1st Cir.2006)(defendant convicted of possession of a firearm while subject to a restraining order). The defendant on appeal claimed certain words within the statute were unable to pass constitutional muster and thus unconstitutional as applied to him. The court agreed with an earlier decision citing United States v. Nason which stated, "in scrutinizing statutory language, we presume... that Congress knew and adopted the widely accepted legal definitions of meanings associated with the specfic words enshrined in the statute." 269 F.3d 10, 16(1st Cir. 2001). Then the court went on to say that "courts are bound to afford statutes a practical, commonsense reading." O'Connell v. Shalala, 79 F.3d 170, 176(1st Cir. 1996). Eventually ruling that words and common definitions of the statute did pass constitutional muster. Accord Collatos v. Boston Retirement Bd., 396 Mass. 684, 687(1986)(In interpreting a statute the court must presume that the Legislature intended what the words of the statute say). Using the Model Penal Code as a guide for understanding the word 'knowingly,' an individual is deemed to have acted 'knowingly' in regard to a material element of an offense when: in the event that such element involves the nature of his or her conduct or the circumstances attendant thereto, he or she is aware that the conduct is of such a nature or that those circumstances exist; if the element relates to a result of the person's conduct, he or she is conscious of the fact that it is substantially certain that the conduct will precipitate such a result. Lastly, when the term knowingly is used in an indictment, it signifies that the defendant knew what he or she was going to do and, subject to such knowledge, engaged in the act for which he or she was charged. Plaintiff

notes 'knowingly' is used in both statutes and indictments charging him. In Commonwealth v. Richard Semegan, 72 Mass. App. Ct. 478(2008)(defendant was indicted under M.G.L. c. 269 §10(h) and §10(m), the court acknowledged the degree of difficulty presented to trial judges when called on to interpet this statute, and that the principle requiring the court to give full effect to all words of a statute, assuming none to be superflous. "Without question, this statute is no grammatical paragon." Id. at 480. See Commonwealth v. Shea, 46 Mass. App. Ct. 196, 197(1999)(stating that a court must give effect to all words of a statute, assuming none to be superfluous). The court also noting, Commonwealth v. Hampe, 419 Mass. 514, 518 (1995), that where possible courts must seek to harmonize the provisions of any statute with related provisions where they are part of a single statutory scheme. Cf. Commonwealth v. Brooks, 366 Mass. 423, 428(1974)("words in a statute must be considered in light of the other words surrounding them"). And when the plain language of a statute unambigously reveals its meaning, the revealed meaning is not eccentric, courts need not consult other aids to statutory construction. See Salinas v. United States, 522 U.S. 52(1997); United States v. Charles George Trucking Co., 823 F.2d 685, 688(1st Cir 1987). "Our starting point in statutory interpretation is the statutes's plain meaning, if it has one." United States v. Dauray, 215 F.3d 257, 260(2nd Cir. 2000)(Congress had not defined the terms at issue; the court considered the ordinary, commonsense meanings of the words). "The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there." BedRock Ltd., llc v. United States, 541 U.S. 176, 183(2004) citing Connecticut National Bank v. Germain, 503 U.S. 249, 254-55(1992).

OFFENDING CHARACTERISTICS CREATING SUBCATEGORY OF FIREARMS AND DEVICES

The subcategory or secondary designation of 'Large Capacity' is unique to Massachusetts. Or alternatively, sparingly used by any other states' with the exact meaning or similiar meaning to make such a subcategory or 'enhancing class' of devices. This 'enhancing class' of firearms/devices is far from

commonplace or general knowledge. Massachusetts's licensing scheme places firearms or devices which are capable of holding more than ten bullets into a subcategory, requiring additional licenses and fees, this category is 'large capacity.'

The intent deemed indispensable is merely the intent to do the proscribed act, rather than the intent to violate the law. C.J.S., Weapons §5(a), at 482. In Staples v. United States 511 U.S. 600(1994) the defendant was charged with possession of a machine gun under a federal statute and claimed that he was unaware of the automatic firing capabilities of the firearm and thus should not be convicted without the government having to prove a mens rea. The court discussed guns and if they fall into a public welfare offense category and thus a dangerous device which when one is dealing with such a device they are subsequently put on notice of probability of strict regulation and must determine at their peril if one's conduct falls within the statute, however, the court noted that guns DO NOT fall within the category of dangerous devices and thus cannot be said to put gun owners suffciently on notice of the liklihood of regulation to justify interpating the statute here as not requiring proof of knowledge of a weapon's characteristics. Id. at 611-12(emphasis added by author). The court noting that roughtly fifty percent of American homes contain at least one firearm and in the vast majority of states buying a shotgun or rifle is a simple transaction that would not alert a person to regulation any more than would buying a car. Id. at 612. Ultimately, the court posed the question to be decided as: "whether the defendant must know of the particular characteristics that make his weapon a statutory firearm." Id. at 609. The court answered this question in the positive that in order to obtain a conviction the Government must prove that the defendant knew of the features of his AR-15 that brought it within the scope of the statute. Id. at 619. In reaching this decision the court discussed public welfare offenses and their scope. The Government contended that it needed to only prove simple possession of a firearm in the ordinary sense of the termto convict. Id. at 608. The same 'simple possession' is used by the state in Massachusetts's firearm prosecutions, notwithstanding the word 'knowingly' is used in the statute(s) and indictment(s).

This Plaintiff notes he has been convicted of several counts under M.G.L. c. 269 §10(m), he was charged with knowingly possessing a large capacity feeding device/firearm; under the same chapter only a different subsection, ch.269 §10(c),an individual would be charged with unlawfully owning, possessing, or carring a 'machine gun.' Yet, §10(c) does not contain the word 'knowingly,' therefore there must be varying levels of knowledge or rather the legislature intended to require a heightened level of knowledge of the device or firearm in question by its' use of the word 'knowingly' in certain sections and omitting it in others. See generally Tart at 502, ante (discussion of word knowingly used in a reglatory statute in some subsections of a chapter and omitted in other subsections of the same chapter). The court in Staples noted the commonlaw requirement of a mens-rea in all cases and began its discussion of public welfare offenses. Most notably the court acknowledges that, "the purpose and obvious effect of doing away with the requirement of guility intent is to ease the prosecution's path to convictions. Id. at 614. quoting Morissette at 263. The court then stated that "they are reluctant to impute that purpose to Congress, where it would mean easing the path to convicting persons whose conduct would not even alert them to the probability of strict regulation in the form of a statute such as the present one. Staples at 615-616. After discussing several cases dealing with 'dangerous devices' and the historical development and construction of public welfare offenses the court pointed out "close adherence to the early cases described above might suggest that punishing a violation as a felony is simply incompatible with the theory of public welfare offenses. In this view, absent a clear statement from Congress that mens rea is not required; we should not apply the public welfare offense rationale to interpret any statute defining a felony offense as dispensing with mens rea." Id. at 618. Also the court acknowledged that where dispensing with mens rea would require the defendant to have knowledge of traditionally lawful conduct is not acceptable, and a severe penalty is a further factor tending to suggest that Congress did not intend to eliminate a mens rea requirement and in such a case, the usual presumption that a defendant must know the facts that make his conduct illegal. Id. at 619. The court overturned the lower court's conviction and held that if Congress had intended to make outlaws

of gunowners who were wholly ignorant of the offending characteristics of their weapon, and to subject them to lengthy prison terms, it would have spoken more clearly to that effect. Id. at 620.

In his concurring opinion Justice Ginsburg notes that the Government conceded that the statute requires proof that the defendant 'knowingly' possessed the gun and that the question before the court is not if knowledge is required but what level suffices; 1) knowledge simply of possession of the object, 2) knowledge, in addition, that the object is a dangerous weapon, 3) knowledge, beyond dangerousness, of the characteristics that render the object subject to regulation, for example, awareness that the weapon is a machine gun. Id. at 621. The first reading effectively dispenses with mens rea and quoting United States v. Harris to support the court's holding that "mere unregistered possession of certain types of regulated weapons often difficult to distinguish from other, non regulated types," has been held inadequate to establish the requisite knowledge. Id. at 621-22; Harris, 959 F.2d 246, 257-61(D.C. Cir. 1992)("we believe that if Congress, against the background of widespread lawful gun ownership, wished to criminalize the mere unregistered possession of certain firearms often in-disguisable from other, non-prohibitedtypes it would have spoken clearly.") Thus, "only the third reading, then, suits the purpose of the mens rea requirement to shield people against punishment for apparently innocent activity." Staples at 622. Regulations to which firearm possession is subject to are not "sufficiently intrusive that they impinge upon the common experience that owning a gun is usually licit and blameless conduct." Id. at 613. In sum, the Supreme Court in Staples held that in order to convict the defendant **for** possession of an unregistered firearm the Government must prove that the defendant knew of the characteristics of the firearm that made it subject to the provisions of the statue. 511 U.S. at 619. Accord United States v. Anderson, 885 F.2d 1248 (5th Cir. 1989)(Court stressed and ultimately held that government must prove mens rea in any criminal prosecution, declaring it too severe for community to bear, and certainly not intended by Congress to subject serious criminal punishment on one who possess what appears to be and innocently and reasonably believes to be wholly ordinary and legal pistol merely because it's been modified, unknown to him

to be fully automatic). See generally United States v. Williams, 872 F.2d 773(6th Cir. 1989)(requiring mens rea). Cf. Bryan v. United States, 524 U.S. 184(1998)('knowingly'does not require that the defendant know that his actions are unlawful, but only that he know he is engaging in the activity that legislature has proscribed, in analyzing Staples the court noted that the Supreme Court required knowledge that weapon possessed was a 'machine gun,'thus bringing it into the registration requirement). In Floyd Carter v. United States, 530 U.S. 255, 259(2000), the court stated "the presumption in favor of scienter requires a court to read into a statute only that mens rea which is necessary to seperate wrongful conduct from 'otherwise innocent conduct.'" quoting United States v. X-Citement Video, 513 U.S. 64, 72(1994). The court in Floyd than quotes Staples in that the accused must know the weapon possessed has the characteristics brining it within the scope of the statute to avoidcriminalizing the innocent activity of gun ownership. Staples at 611-12. See also, e.g. Liparota v. U.S., 471 U.S. 419, 426(1985); Morisette at 270-71; U.S. v. Daniel Gendron, 18 F.3d 955(1st Cir. 1994) (discussion of how to apply 'knowingly' when used once in a statute yet applied to other subjections of same child pornography statute).

In Shea, supra, the defendant asserted that the holding in Staples, required the government to prove knowledge of the firearm the defendant used in the crime came within the gun statute, however, the Appeals Court found that the defendant's vicious will in committing principal offense dispensed this argument. 150 F.3d 44. Additionally, the U.S. Court of Appeals for 1st Circuit in affirming Shea's conviction from U.S. District Court of Massachusetts acknowledged the holding in Staples citing U.S. v. Brantley, 68 F.3d 1283, 1289 (11th Cir. 1995), "the

Staples court wished to avoid dispensing with mens rea requirement where doing so would criminize a broad range of apparently innocent conduct." The Supreme Court recently affirmed its understanding that where, as here, Congress employs a 'knowingly' standard for culpability, see 18 U.S.C. §924(a)(2), such a word choice normally signifies that the government needs to prove only that the defendant knew of the facts compromising the offense, and nothing more. Commonwealth v. Meade, at 226, fn 5, citing Bryan, 524 U.S. 184. In Commonwealth v. Fondakowski, the defendant was convicted after a jury waived trial of failing to register as a sex offender, and on appeal the court held there was sufficient evidence to support conviction. 62 Mass. App. Ct. 939(1st Cir. 2005). The statute with which the defendant was charged with required the Commonwealth to prove that the defendant 'knowingly' violated one or more of the subsections of the statute. Id. The court stated that, "when the word 'knowingly' is used in a criminal statute, it commonly imports a perception of the facts requisite to make up the crime." Id. citing Commonwealth v.Altenhaus, 317 Mass. 270, 273(1944), Commonwealth v. Horsfall, 213 Mass. 232, 237 (1913).

In United States v. Weintraub, the defendants were convicted for criminal violations of and conspiracy to violate The Clean Air Act and otherregulations. The heart of the defendants' appeal was the question of what level of scienter is required to prove a criminal violation when the statute uses the word 'knowingly.' 273 F.3d 139(2001). After discussing how various courts have ruled the court noted that, "determing the extent of mens rea required by a statute thus involved a commonsense evaluation of the nature of the particular device or substance Congress has subjected to regulation and the expectation that individuals may legitimately have in dealing with the regulated

items." Id. at 147-48 quoting Staples at 619. And the touchstone is the defendant's "settled expecations" about the regulated conduct. Weintraube at 148 quoting X-Citement Video at 71. FN2 The court in Weintraub, stated their understanding of the appropriate mens rea standard was informed by two Supreme Court decisions applying the scienter requirement of one statute to two different sets of facts. Id. The two decisions are Staples, supra, and Freed, 401 U.S. 601 (1971)(defendant in case possessed hand grenades). Ultimately, the court noted that the long history of substantially unregulated possession of guns in the United States meant that a possessor would not reasonably expect that possession to be closely regulated. Weintraub at 148. Simple knowledge that it was a gun was inadequate to create an expectation that its possession could be criminal. Id. quoting Staples at 610-12(emphasis added by author). Knowledge that the weapon was automatic was necessary to distinguish between regulated and traditionally unregulated weapons and hence between likely and culpable and likely innocent conduct. Although, like grendes, guns are dangerous, but because the latter have historically been unregulated or lightly regulated, a defendant who knew only that he possessed a gun would not reasonably expect regulation. Id. The analysis of guns to asbestos ultimately proved that there WAS a reasonable

---

FN2: Dan M. Kahan & Donald Braman argue that one's cultural background and world view profoundly affects one's stance on gun control debate. See More Statistics, Less Persuasion: A Cultural Theory of Gun-Risk Perceptions, 151 U. PA. L. Rev. 1291 (2003). Therefore a reasonable inference would be that a natural born or long term resident of MA would have more understanding or knowledge and possible reservations about owning any firearm(s) than a new resident to MA would have; and that the possible differences being more pronounced if new resident comes from a state were firearms are commonplace.

expectation of regulation in dealing with asbestos which was strictly regulated at the local, state and federal levels and no reasonable person could be unaware that asbestos is closely regulated. Id. at 149.

In Christopher Dean v. United States, 129 S.Ct. 1849, the court upheld the defendant's convictions on all counts (11th Cir. 2009). Stating enhancing classes of statute did not require seperate proof of intent, thus minimum mandatory sentence was warranted by defendant's discharge of gun during commission of his original crime. Court stated that occurs without respect to a specific actor and therefore without respect to any actor's intent or culpability....it is whether something happened not how or why it happened that matters. Id. at 1853. The Petitioner goes on to argue that if statute is viewed as silent on intent question that silence compels a ruling in his favor, noting a presumption that criminal prohibitions include a requirement that the Government prove the defendant intended the conduct made criminal. Id. at 1855. The court answered by stating "on a number of occasions we have read a state-of-mind component into an offense even when statu :ry definition did not in terms so provide." Id. at 1855 quoting United States Gypsum Co., supra, "Some indication of congressional intent, express or implied is required to dispense with mens rea an element of a crime." See generally Staples v. United States. Petitioner Dean argues the presumption is especially strong in his case in regards to the statute. Dean, 129 S.Ct. at 1855. The court responded noting"1) while it is unusual to impose criminal punishment for the consequences of purely accidental conduct, it is not unusual to punish individuals for the for the unitended consequences of their unlawful acts." Id. at 1855 quoting 2 W. LaFave, Substantive Criminal Law §14.4,

pp 436-37 (2d Ed.2003). And 2) Justice Blackstone:

> If any accidental mischief happens to follow from performance of a lawful act, the party stands excused from all guilt; but if a man be doing anything unlawful, and a consequence ensues which he did not foresee or intend, as the death of a man or the like, his want of foresight shall be no excuse ; for, being guility of one offense, in doing antecedently what is in itself unlawful, he is criminally guilty of whatever consequences may follow the first misbehavior

Dean at 1855 quoting W. Blackstone, Commentaries on Laws of England 26-27(1769). Both quotes the court used to show that Dean was already guilty of unlawful conduct, robbing a bank, which was no accident and he is thus liable for consequences of the later unlawful act, the firing of the firearm. Dean at 1855.

In a recent Massachusetts case dealing with the word knowingly, Commonwealth v. Ulises Ramirez, the defendant was a convicted sex offender and failed to register which was required by statute, after conviction at trial court defendant appealed and won. 69 Mass. App. Ct. 9 (2007). The statute the defendant was originally convicted under, M.G.L. c.6 §178 (h), contained the word knowingly and the Commonwealth failed to prove beyond a reasonable doubt that the defendant knowingly did not register. Id. Since the statute Ramirez was charged under contained the word 'knowingly' and it is a settled rule of statutory construction that all words in a statute must be given a meaning. Commonwealth v. Burgess, 426 Mass. 206, 224-25.(1997). 'Inserting the word knowingly into the statute cannot be treated as immaterial.' Commonwealth v. Horsfall, 213, 237(1913). "When the word knowingly is used in a criminal statute it commonly imports a perception of the facts requisite to make up the time." Ramirez at 11-12 citing Fondakowski, supra, quoting Altenhaus at 273. Following the logical framework of these established cases the appellate court found

that the Commonwealth was required to prove that the defendant knew of the requirement to register but did not despite his knowledge. Ramirez at 13. The court then elborated by stating that "defendant's knowledge may be proven by circumstantial evidence, that proof must be specific to this defendant, rather than to the general population or some subset." Id.(emphasis added by author). The appellate court then furthers their point by citing several relevant cases. Commonwealth v. Dellamano, 393 Mass. 132, 136(1984)("We have held that where knowledge is an essential element of the offense charged, proof of that knowledge is a prerequisite to conviction). The knowledge of the defendant is personal to him and statute recognizes no substitute." quoting Commonwealth v. Holiday, 349 Mass. 126, 128(1965); Commonwealth v. Rosenberg, 379 Mass. 334, 338(1979). Finally, absent defendant's conscious disregard of the information necessary to provide him with the requisite knowledge the Commonwealth cannot meet its burden merely by establishing that it was available to accused. Commonwealth v. Ramirez supra, at 13. See e.g., Altenhaus, supra;Commonwealth v. Boris, 317 Mass. 309, 315(1944); Commonwealth v. Thureson, 371 Mass. 387, 390(1976);Commonwealth v. Nieves, 446 Mass.583, 597-98(2006) (statutes are to be interpreted to avoid unconstitutionality); Vaughan v. Max's Market Inc., 343 Mass. 394, 397(1961)(statutes are to be so construed as to avoid an unconstitutional result or likelihood thoereof). Furthermoe, the United States Supreme Court addressed constitutionality of a Los Angeles's ordinance making it illegal for convicted felons to remain in city for more than five days without registering. The Supreme Court reversed appellant's conviction holding that 'actual knowledge of' the duty to register or proof of probability of such knowle

knowledge and subsequent failure of the duty to comply are necessary before a conviction under ordinance can stand. Lambert, 355 U.S. 225. The court also found the ordinance violated due process and was at most a law enforcement technique designed for the convenience of law enforcement agencies. Id. at 228-29. See Rarmirez, at 13 n.6; State v. Young, 140 N.C. App. 1, 12(2000)(ignorance of the law is no excuse yet statute at issue doesn't require the state to prove intent, due process requires defendant to have knowledge, actual or constructive of statute's requirements before he can be charged with its violation); Varnes v. State, 63 S.W.3d 824, 831 (Tex. Ct. App. 2001)("due process requires actual notice or reasonable propability of actual notice before a violation of registration statute can be prosecuted against an individual.");People v. Patterson, 185 Misc.2d 519, 526, 708 NY S.2d 815(Crim.Ct. 2000) ("People do not need to allege or prove that a sex offender charged with failure to register acted knowingly or intentionally . However...it is nevertheless plain that before a defendant can be prosecuted for failure to register, he must be given the statutorily mandated notice of his duty to register as a sex offender. Such notice is also likely required by due process of law."). The court in Commonwealth v. Buckley. 354 Mass. 508, 510 (1968) is quoted as saying: "statutes purporting to create criminal offences which may impinge upon public's access to constitutionally protected matter have been construed to require knowledge by the accused of the facts giving rise to criminality." See Demetropolos v. Commonwealth, 342 Mass. 658 661(1961). The Supreme Judicial Court of Massachusetts further explained that "such an interpretation is in part, at least, to preserve interests protected under First Amendment to the Constitution of the United States and that some indication that

due process clause of Fourteenth Amendment may require knowledge in a range of situations not limited to First Amendment's aspects See Commonwealth v. Corey, 351 Mass. 331, 331-34(1966); Lambert at 228-230. In United States v. Kitsch, 2008 U.S. Dist. LEXIS 58904 (E.D. Pa.2008) the court granted defendant's motion for leave to require the government to prove scienter with regard to his status as a felon. The defendant had been indicted under federal statute prohibiting possession of firearms, ammunition, and body armor by convicted felons. The court articulated the applicable rule as "where an element of a statute has the effect of making otherwise lawful conduct a criminal offense...the presumption exists that the element includes a scienter requirement." The court held that the word 'knowingly' in the statute modified both the elements of possession and defendant's awareness of his status as a convicted felon. The court stated that it would have made the same ruling pre-HELLER, it noted that the added benefit of avoiding potential doubts post-HELLER. Because, the court stated, Heller identified an enumerated constitutional right, and a "statute that imposes criminal penalties for the exercise of an enumerated constitional right despite the defendant's reasonable belief in good faith that he has complied with the law, must at the very least, raise constitutional doubts." Id.

In a Massachusetts case dealing with illicit receipt of child pornography, United States v. Gendron, 18 F.3d 955(1st Cir. 1994), the court rejected a Ninth Circuit's conclusion about the statute in question. Stating that in their view and view of all courts who have considered the matter, the statute's use of the word 'knowingly' modified not only the word 'receives,'

but also the statute's description of the 'received' material's pornographic content. That is to say, we understand that the statute requires, for conviction, that the government prove not only that the defendant 'knowingly received' material that he knows the material contains a visual depiction of a person engaging in sexually explicit conduct, but also that the defendant knows that the person so depicted is a minor. Id. at 958. The court conceded that one cannot automatically, simply from the position of the words in the sentence, just which of the words following 'knowingly' the word knowingly is meant to modify. However, the linguistic fact simply reflects the more basic facts that statements and parts of statements quite often derive their meanings from context. The sentence "John knows that people speak Spanish in Teguicigalpa, which is the capital of Honduras," taken by itself, leaves us uncertain whether or not John knows that Teguicigalpa is the capital of Honduras; but the context of the story in which the sentence appears, a context that includes other sentences, may clear up our uncertainity and leave us with no doubt at all. Id. Finally, the court stated that Congress's explicit use of the word 'knowingly' seems to likely of meant that it did intend to insist that a defendant know the child-pronography nature of the material. Id. at 959. The child pornography statute reads:

> (a) any person who--
>
> ......
>
> (2)knowingly receives or distributes, any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which contains materials which have been mailed so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution in interstate or foreign commerce by any means including by computer or through the mails, if--
>
> (A) the producing of such visual depiction invlove a minor engaging in sexually explicit conduct;

(B) such visual depiction is of such conduct;..

18 U.S.C. § 2252(a)(2)

In Ignacio Carlos Flores-Figuero v.United States, 129 S.Ct. 1886(2009). the court held that in order to convict defendant under aggravated identity theft for knowingly transferring, possessing, or using, without lawful authority, a means of identification of another person, government must prove defendant knew that means of identification he or she transferred, possessed or used, did in fact belong to another person. The court comes to this conclusion that the word 'knowingly' applies to all subsequently listed elements of the crime rather than the first few words of statute as government claims. Id. at 1890. Justice Breyer, delivering the court's opinion, says that "where a transitive verb has an object, listeners in most contexts assume that an adverb, such as knowingly, modifies the transitive verb, telling the listener how the subject performed the entire action, including the object set forth in the sentence. Id. at 1890. Citing several examples of his grammar interpretations. Id. at 1890-91. Lastly, "the manner in which the courts ordinarily interpet criminal statutes is fully consistent with this ordinary English usage." Id. at 1891. See X-Citement Video Inc., supra(Court ordinary read a phrase in a criminal statute that introduces the elements of a crime with the word knowingly as applying to each of all subsequent elements). See also Liparota v. United States, 105 S.Ct. 2084(New York court held knowingly applied to 'in any manner not authorized by law' section of staute despite the legal cliche of ignorance of law is no excuse). Cf. United States v. Meyer, 864 F.2d 214 (1st Cir. 1988)(Circuit Judge John Brown dissenting)("..where Congress or its specifically

directed agency defines the crime in words requiring a consciousness of illegal action, the Government must sustain this burden to substantiate a verdict (finding) of guilty.")

Based on the above cases the use of the word 'knowingly' in M.G.L. c.269 §10(m) and M.G.L. c. 140 §131M undoubtedly requires that the Commonwealth must prove a heightened level of knowledge, beyond simple possession. The legislature's usage of the word knowingly cannot be treated as immaterial as used in the indictments and statutes. Therefore, the required level of knowledge is the knowledge beyond dangerousness, and of the characteristics that render the object subject to regulation. The Commonwealth is required to prove that John Cassidy not only knew of the characteristics that brought the weapons and devices into regulation, but also that he knew of the four tiered state licensing scheme required to lawfully possess them. FN3. This means that the word knowingly not only applies to the first element of the statute(s), possession but all other elements. Concluding that this Commonwealth cannot meets its burden or sufficiency of evidence and all convictions against John Cassidy should so accordinly be dismissed/withdrawn. All matters should be revoked as the Commonwealth did not meets its burden of proving sufficient knowledge of the gun licensing scheme and the characteristics which bought his once legal and lawful possession of weapons into a new category of devices in Massachusetts, subjecting him to inflexible, stiff criminal penalities for <u>in home</u> possession of firearms.

In expectation of this Commonwealth citing such cases as <u>Commonwealth v. Stephen O'Connell</u>, 432 Mass. 657(2000).;

---

FN:3 In John's case this is the fact that Massachusetts's multi-tiered gun licensing scheme creates an entire class of new weapon requiring permits to carry even if intention is for in home use. This category is large capacity and requires addition fees and paperwork; carrying very strict criminal punishment and

Commonwealth v. Sampson, 383 Mass. 750 (1981); Commonwealth v. Bacon, 374 Mass. 358 (1978); Commonwealth v. Papa, 17 Mass. App. Ct. 987(1984). Which generally hold that the Commonwealth needs not prove that the defendant knew the physical characteristics of the firearm possessed. John Cassidy notes that these cases rely on the 'carrying' aspect of knowledge which is not present in the instant case which deals solely with possession and moreover rely upon Freed, supra, which spoke direcly about owning a hand grenade, which the court clearly states is not by any means an innocent act and likes it to owning illegal drugs. Freed at 609. The Staples case is on point regarding when statutes use the word 'knowingly' and should be followed over the aforementioned cases. See also Weintraub, supra. Lastly, the majority of firearm offenses in Massachusetts are 'paired' with some overarching criminal illegalities such as drugs, gangs, robbery or obliterated serial numbers. None of which are present in the instant case and could likely be a possible reason why these firearm offenses are often easily dispensed with because of the overarching accompanying crime being actively committed, and the 'knowledge' of the principle crime committed.

In the coming pages this point will be thoroughly discussed and show that in a recent First Circuit case, Meade, 175 F.3d 215(1999), the First Circuit acknowledged and followed the Staples holding saying that, "firearm possession is an act sufficiently innocent that no one could be expected to know that 'they' would violate the law by possessing a gun and without more than simple possession it is not the kind of activity comparable to possession of hand grenades, narcotics or child pornography." Meade at 226 quoting Staples at 610-12. Lastly, the felony

firearm charges stem not from some simultaneously committed illegal act or crime, but solely from this Plaintiff's deficiency in a state gun license. This license and the entire licensing scheme is nothing more than excise taxes on gun owners; a multi-level firearm tax scheme based upon private citizen's ownership and exercise of a fundamental right of bearing arms.

PUBLIC WELFARE OR STRICT LIABILITY OFFENSES DISCUSSED

The leading federal decision which popularized the term public welfare offenses is Morissette, 342 U.S. 246. Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand, was congenial to an intense individualism that took deep and early root in American soil. Morissette, at 252. As the states codified common law crimes, even if their enactments were silent on the subject, their courts assumed that the omission did not signify disapproval of the principle but merely recognized that intent was so inherent in the idea of the offense that it required no statutory affirmation. Id. In Morisette the court stated:

> The unamity with which the courts have adhered to the central thought that wrongdoing must be conscious to be criminal is emphasized by the varity, disparity and confusion of their definitions of the requisite but elusive mental element. However, courts of various jurisdictions and for purposes of different offenses have devised a working formulae, if not scientific ones, for the instructions of juries around such terms as 'felinous intent,' 'criminal intent,' 'malice aforethought,' 'guilty knowledge,' 'fraudulent intent,' 'willfulness,' 'scienter,' to denote guilty knowledge, or 'mens rea' to signify an evil purpose of mental culpability. By use or combination of these various tokens, they have sought to protect those who were not blameworthy in mind from convictions of infamous common-law crimes.

Id. The court in Morissette cited Judge Andrews in People v. Flack, where he is quoted, "it is alike the general rule of law, and the dictate of natural justice, that to constitute guilt

there must be not only a wrongful act, but a criminal intention. Under our system both must be found by the jury to justify a conviction for a crime." 125 N.Y. 324, 334, 26 N.E. 267, 279 (1891). The court also expressly stated public welfare or strict liability offense penalties are relatively small and conviction does no grave damage to an offender's reputation. Morisette at 256. The court noting that it has never required that a statute "employs the terms of" or "derive directly from" a common law crime to be subject to "the general rule at common law...that the scienter is a necessary element in..every crime.." Id. at 258 Courts are familiarized with the pathway to ease convictions by relaxing the orthodox requirement of a mens rea, the danger in that in the case of true crimes where the penalty is severe and the need for ordinary criminal law safeguards is strong, courts following the false analogy of public welfare offenses may now and again similarly relax the mens reas requirement, particularly in the case of unpopular crimes, as the easiest way to secure desired convictions. Francis B. Sayre, Public Welfare Offenses, 33 Colum. L. Rev. 55,79(1933).(emphasis added by author). Thus relaxing the requirement of proof of mens rea at the cost of punishing the innocent. Our legal system recognizes the 'freedom of human will and a consequent ability and duty of the normal individual to choose between good and evil.' Morisette at 250. 21 Am. Jur. 2d Criminal Law § 133(2011) discussing strict liability and public welfare offenses "the imposition of strict liability for an offense, without regard to the offender's mental state is most commonly found in the regulation of

activities involving public health, safety and welfare." Citing *U.S. v. Debra Smith*, 29 F.3d 270 (7th Cir. 1994); *State v. Shaffer*, 114 Ohio App. 3d 97, 682 N.E.2d 1040(3rd Dist. Hardin County1996). Although a criminal conviction generally requires both an act and a criminal or wrongful intent, 21 Am. Jur. 2d Criminal Law § 117 (2011), the general rule that intent is an element of an offense does not always apply to public welfare offenses created by statute, *People v. Telfer*, 233 Cal. App. 3d 1194, 284 Cal. Rptr. 913 (4th Dist. 1991). "Offenses aimed primarily at the protection of public welfare and safety may be created as strict liability offenses with no scienter required other than the mens rea needed to commit the act." 21 Am. Jur. 2d Criminal Law § 133 quoting *People v. DiLorenze*, 154 Misc. 2d 485, 585 N.Y.S. 2d.675(City Crim. Ct. 1991). And the imposition in this context of absolute liability may be explained on the grounds that the proscribed conduct may seriously threaten a community's health or safety. 21 Am. Jur. 2d Criminal Law § 133 citing *Commonwealth v. CSX Transp. Inc.*, 653 A.2d 1327 (Pa. Commonwealth Ct. 1995). Under this view, the threat to the public health and safety posed by the thing or activity that is the object of the statute is considered sufficient to place a defendant on notice of the likelihood of its regulation and thus, to excuse the need to prove mens rea. 21 Am. Jur. 2d Criminal Law § 133 citing *U.S. v. Wilson*, 133 F.3d 251 (4th Cir. 1997). However, public welfare offenses are the exception to the general rule requiring mens rea. 21 Am. Jur. 2d Criminal Law § 133 citing *U.S. v. Ahmad*, 101 F.3d 386 (5th Cir 1996). The primary purpose of enforcing such statutes is to protect a victim from the potential of serious harm, not to punish the offender. 21 Am. Jur. 2d Criminal Law § 133 citing *State v. Squires*, 108 Ohio App. 3d 317, 671 N.E.2d 627(2d Dist. Montgomery County 1996)(emphasis added by author). Strict liability public welfare offenses typically are offenses that involve only light,

*U.S. v. Ahmad*, 101 F.3d 386(1996), *Debra Smith,* supra, *State v. Marshall*, 821 S.W.2d 550 (Mo. Ct. of App. ED 1991) or relatively minor, *State v. Slayton*, 214 Ariz. 511, 154 P.3d 1057(Ct. App. Div.1 2007) penalties and do not cause grave harm to the offender's reputation. *Debra Smith*, supra; *Marshall,* supra. The possible punishment that can be imposed for violation of statute is an important factor in determining whether the offense in question is one of absolute liability; if punishment is great it is less likely that the legislature intended to create an absolute liability offense. *People v. Avery*, 661 N.E.2d 361(1st Dist. 1995). See 21 Am. Jur. 2d Criminal Law § 135 (2011) for factors considered imposing strict liability. It is universally agreed that an offense with a harsh penalty is not properly considered a public welfare offense. Undoubtedly, a penalty imposed merely for enforcement should be slight and thus can ameliorate the harshness of absolute or strict liability. Additionally, public welfare offenses are "a specialized type of regulatory offense involving...a penalty so light that in such exceptional cases courts can safely override the interests of individual innocent defendants." Sayre, at 68. Accordingly, strict liability crimes should not imprison a defendant, if the possible penalty be serious, the individual interests of the defendant weights too heavily to allow conviction without a guilty mind. To subject defendants entirely free from moral blameworthiness to the possibility of prison sentences is revolting to the community sense of justice. *Id.* at 72. See *Staples,* at 616-618(Public welfare offenses provide "for only light penalties....not imprisonment in the state penitentiary," and "that a felony may never be a public welfare offense."); *State v. Bash*, 130 Wn.2d 594, 925 P.2d 978 (1994)("Offenses which carry harsh penalties, including any sort of prison terms, generally should not be considered strict liability crimes..."). The severe mandatory sentencing which are called for in John Cassidy's case

seem to reasonable show that the statutes are not public welfare offenses and additionally, "for over three-quarters of a century this court has recognized that 'imprisonment in the state prison for a long term of years might be so disproportionate to the offence as to constitute a cruel and unusual punishment." *Opinion of the Justices of the House of Representatives,* 378 Mass. 822, 829-830 (1979), citing *McDonald v. Commonwealth*, 173 Mass. 322 , 328 (1899), aff'd, 180 U.S. 311 (1900). Underlying this principle is "a precept of justice that punishment for crime should be graduated and proportioned to offense." *Opinion of the Justices of the House of Representatives* at 830. Only where the punishment is so disproportionate to the crime that is shocks the conscience and offends fundamental notions of human dignity may we declare a criminal sanction to be in violation of the Eighth Amendment or art. 26. *Id.* at 830 citing *Commonwealth v. Jackson,* 369 Mass. 904, 910 (1976). "In order to mitigate the inherent subjectivity in the "shocks the conscience" standard, a growing number of courts, this one among them, have attempted to develop a more objective framework for the evaluation of the constitutionality of criminal sentences.

*Jackson,* 369 Mass. 904, *cases citied therein.*

An examination of the definitive cases and authorities reveal three criteria for determining when the Legislature, consistent with due process, may dispense with the requirement of guilty knowledge and punish the act, irrespective of the defendant's frame of mind: 1) the defendant must be in position to prevent the violation with little or no care, 2) the penalty is relatively light, 3)a conviction does no grave harm to the offender's reputation. Joseph R. Nolan & Laurie J. Sartorio, 32 Massachusetts Practice: Criminal Law, § 103 "Scienter—Public Welfare Offenses" (2008).

In *Commonwealth v. Wallace*, 439 N.E.2d 848 (1982) the defendant was convicted in Superior Court for operating motor vehicle under influence of drugs and another similar offense. On appeal the court held that it was prejudicial error to preclude the defendant from introducing evidence that he did not know the side-effects of the medication would have on his driving ability and that he did not receive warnings as to its use, thus the judgment was reversed and set aside. The statute the defendant was charged under was c. 90 § 24(1)(a), which makes it criminal for voluntarily consumption of alcohol or drugs which intoxicate one as to impair one's ability to operate a motor vehicle. The court notes that the history of section twenty-four is "a patchwork of judicial decisions and legislature engraftments which beclouds any clear perception of legislative intent." *Id.* at 851. "Nevertheless, there is some indication, both in legislative materials and in judicial decisions, that section twenty-four is not intended to impose criminal liability on unknowing defendants. *Id.* The court strengthens its conclusion "by the rule of construction followed in Massachusetts, which requires particular clarity of language before finding a legislative intent to create a "public welfare" offense punishable by a severe penalty." *Id.* at 852, See also fn. 12(emphasis added by author). Some element of intent or knowledge is required before punishment could be imposed, see *Morissette,* at fn. 13, and because due process considerations may, in some cases require some degree of notice. See *Lambert.* "In absence of specific words saying so", it is not supposed "that the legislature intended to make accidents and mistakes crimes." *Id.* quoting *State v. Brown*, 38 Kan. 390, 393 (1888) FN4.

FN4 In *People's Rights Org. Inc., v. City of Columbus,* 152 F.3d 522, the court had to consider whether the statute containing a scienter requirement imposes strict liability. (1998). "Absence of a scienter requirement in a statute is little more than a trap for those who act in good faith." *United States v. Ragen,* 314 U.S. 513, 524 (1942). After reading the ordinance the court found no scienter requirement and concluded that a

The First Circuit has recognized statutory provisions which lack a requirement of specific intent, such as a public welfare offense, if: (1) "omits mention of specific intent"; (2) "seems to involve what is basically a matter of policy"; (3) imposes a standard that is "under the circumstances, reasonable and adherence thereto properly expected of a person"; (4) carries a "relatively small" penalty; (5) "does not gravely besmirch the reputation" of one convicted; and (6) "is not one taken over from common law." *Commonwealth v. Tart*, 949 F.2d 490, 502 (1991). In *Tart*, the defendant was convicted of unloading raw fish in Massachusetts without obtaining Massachusetts commercial fishing permit. On appeal to United States District Court for the District of Massachusetts his conviction was affirmed. In November 1986 an officer of Massachusetts Department of Fisheries, Wildlife and Environmental Law Enforcement accompanied by an agent of National Fishery Service observed and boarded the defendant's fishing boat while he was unloading fish onto a local pier. When the officers asked to see Tart's federal and state fishing permit he furnished his federal license and stated that he did not believe he needed a state permit because he was federally licensed. The officers seized Tart's catch and informed him that he is required by Massachusetts law, c. 130 § 80 to have a local license in order to unload his catch in Massachusetts. *Id.* at 493. Five days later Tart was seen unloading his catch again, and when the officers inquired about his state fishing licenses he responded that he did not have one, at which point he was arrested. *Id.*

The court went on to discuss the mental state required for a conviction and agreed with one case by quoting that:

---

relatively stringent review of city's assault weapons ban was necessary, and ultimately found most parts of ordinance unconstitutionally vague. *People's Right Org Inc., v. City of Columbus* at 534. See also *People's Right Org. Inc.*, at 534 n.14(discussing whether one could be found to have perversely disregarded a known risk that he possesses an assault weapon merely by virtue of possessing a firearm in the first place).

> Where a criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch the reputation, where the statutory crime is not one taken over from common law, and where legislative purpose is supporting, the statute can be construed as one not requiring criminal intent. The elimination of this element is then not violative of the due process clause.

Id. at 502 citing Holdridge v. United States, 282 F.2d 302, 310 (8th Cir. 1960). The court examined the entire regulatory scheme to determine the legislature's intent. Most other sections of Ch. 130, defining similar licensing violations, likewise prescribe no state-of-mind requirement. Massachusetts gun licensing scheme is contained in Ch.140. The court also found especially noteworthy that in section one of Ch. 130 the legislature employed the term 'knowingly' to define the state of mind required of a person who 'counsels, aids or assists in a violation of any provision of this chapter. Therefore, the express requirement of culpable state of mind section one of Ch. 130 seems to indicate that the Massachusetts's Legislature affirmatively intended to dispense with culpable state-of-mind requirement on the part of a person charged as a principal under section 80. Id. The court held that the offense did not carry a mens rea and even if it did, the fact that Tart was put on notice of the state licensing requirement and five days later was discovered to be unloading his catch without the state permit the officers had suggested he get was more than enough to constitute a violation and moreover was not grossly disproportionate in punishing the defendant. Noting the differences in M.G.L. ch.269 §10(a),(l),(m) all contain the word knowingly and deal with firearms/knives possession, while subsections (b),(c),(h) deal with firearms/ machine guns/ammo possession and do NOT contain the word knowingly.

RULE OF LENITY

This Court cannot find a rational result consonant with common sense as to punish John Cassidy or allow his continued imprisonment. Who being a new resident to the state for purposes of school attendance, was an unemployed student receiving financial assistance in the form of financial aide to attend school; is now a state inmate, convicted of multiple felonies, serving mandatory jail time. Acknowledging the McDonald and Heller holdings on possession of firearms in one's home as a fully lawful, exercise of a natural right as a citizen of the United States, it is undoubtedly an injustice for John to occupy a jail cell and be a convicted felon.

In essence what Massachusetts has done for failing to register his firearms with the Commonwealth is to convict him of seven felonies for exercising his Constitution right and punish him for his prior legal act: his purchase of the firearms. These convictions put him in class of people, felons, whose right to bear arms is taken away for life. A court of any jurisdiction should have no trouble seeing that failing to register firearms that were legally purchased is not such a grievous offense which one should be convicted felon which takes away Second Amendment rights and subjects the convicted to more negative treatment as a felon. In addition the five charges of possession of large capacity device or weapon, ch. 269 §10(m) carry mandatory sentencing in a state prison. In a recent case, Commonwealth v. Riachard Semegan, 72 Mass. App. Ct. 478, 480, the court was asked to interpet the sentencing guidelines for Ch. 269 § 10(m) (2008). The court answered by noting that "without question this statute is no grammatical paragon." referring to M.G.L. Ch.

269 § 10(m), the court concluded that § 10(m) must be interpreted as a person convicted under the statute who, at time of the offense, did not possess a valid FID card, must be sentenced to a minimum sentence of two and one half years in a State prison, but not more than ten years. *Id.* Additionally, a person convicted under 10 (m) who, at the time of offense, possessed a valid FID card "shall not be subject to any minimum sentence." *Id.* at 481. In a 2000 United States Supreme Court case dealing with mandatory minimum sentencing, *Harris v. United States,* 122 S.Ct 2406, Justice Breyer concurring in part and concurring in judgment stated that, "statutory mandatory minimums generally deny the judge the legal power to depart downward, no matter how unusual the special circumstances that call for leniency." Thus, if the statutory language "can plausibly be found to be ambiguous," rule of lenity requires the defendant be given "benefit of the ambiguity." *Commonwealth v. Roucoulet*, 413 Mass. 647, 652 (1992). In *United States v. Hayes*, 129 S.Ct. 1079 (2009), the defendant was prosecuted under 18 U.S.C. § 922(g)(9) for possession of a firearms after having been convicted of a misdemeanor crime of domestic violence. The majority rejected the application of the rule of lenity after acknowledging the hardships the court was presented with.

In Chief Justice Roberts' dissent, joined by Scalia, he stated:

> this is a textbook case for application of the rule of lenity....if the rule of lenity means anything, it is that an individual should not go to jail for failing to conduct a fifty-state survey or comb through obscure legislature history. Ten years in jail is too much to hinge on the will-o-wisp of statutory meaning pursued by the majority.

*Hayes* at 1093. But see *Muscarello v. United States,* 118 S.Ct 1911(1998)("To invoke rule of lenity, we must conclude that there is a grievous ambiguity or uncertainty in the statute."); *Liparota v. United States*, 471 U.S. 419, 428 (1985)("Application of the rule of

lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislatures, the prosecutor, and the court in defining criminal liability."); *Rewis v. United States*, 401 U.S. 808, 812 (1971)("Ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."); *State v. Michael Knight*, 44 Kan.App.2d 666 (2010)(noting the general rule that criminal statutes must be strictly construed in favor of accused and any reasonable doubt is resolved in favor of accused); *State v. Zeit*, 39 Kan.App.2d 364, 368, (2008)(The rule of lenity encompasses laws establishing criminal liability, this is because citizens should have fair notice in the statute of conduct that is criminal); *Commonwealth v. Carrion*, 431 Mass. 44, 45-46 (2000)(recognizing rule of lenity); *Commonwealth v. Robert Smith*, 431 Mass. 417, 425 n.10 (2000)(All criminal statutes are to be strictly construed, and any reasonable doubt as to the statute's meaning must be resolved in the defendant's favor); *Commonwealth v. Richard Perry*, 391 Mass. 808 (1984)(noting that the principle that criminal statutes must be construed strictly against the Commonwealth); *Commonwealth v. Rhodes*, 451 N.E.2d 1151 (Mass. 1983)(Criminal statute must be sufficiently explicit to give clear warning as to proscribed activities, with any ambiguities to be construed strictly against Commonwealth); *Commonwealth v. Gagnon,* 387 Mass. 567, 569 (1982)(recognizing the doctrine of statutory interpretation whereby criminal statutes are construed strictly against the Commonwealth); *Commonwealth v. Clinton*, 374 Mass. 719, 721 (1978)(the basic principles that criminal statutes are to be strictly construed against the Commonwealth and in favor of the defendant); *Commonwealth v. Paccia*, 338 Mass. 4, 6 (1958)(Ordinary rules of statutory construction require the court to construe any criminal statute strictly against the Commonwealth). Thus, a criminal defendant facing a loss of

liberty is not something to be taken lightly at any level or stage of a court proceeding, and since "no one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *United States v. Batchelder*, 442 U.S. 114, 123 (1979) quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939), the spirit of the rule of lenity, fundamental fairness, lies at the heart of a respectable criminal justice system. See *McBoyle v. United States*, 283 U.S. 25, 27 (1931)(the principle of 'fair warning' motivates the lenity rule)(Holmes,J).

## II. PROSECUTION FOR IN HOME POSSESSION OF FIREARMS OFFENDS DUE PROCESS AND THE VOID FOR VAGUNESS DOCTRINE

A criminal statute must be sufficiently clear to give notice of the prohibited conduct. The statute must define the criminal offense with sufficient definiteness that orginary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. Proscribed conduct need not, however, be set forth by precise legal definition or with mathematical precision. A person may fairly be required to conform to conduct to an imprecise but comprehensible normative standard. It is axiomatic that the "starting point for interpreting a statute is the language of the statute itself." In re LaFata 483, F.3d 13 (1st Cir.2007) quotingConsumer Prod. Safety Comm'n v. GTE Sylvania, 447 U.S. 102, 108(1980). "When the statute in question is one of a criminal nature, it nevertheless, 'must be construed, if possible such that no clause, sentence or world shall be superflous, void, or insignificant...in other words, no part of a legislative enactment is to be treated as insignificant or unnecessary, that there is a presumption of purpose behind every sentence, clause, or phrase.."State of Connecticut v. Kalman, 93 Conn. App. 129, 135-36(2006) quoting State v. Peeler, 271 Conn. 338, 434-35(2004) "To demonstrate that a statute is unconstitionally vague as applied to him, the defendant must..demonstrate beyond a reasonable doubt that he had inadequate notice of what was prohibited or that he was the victim or arbitrary and discriminatory enforcement..The void for vagueness doctrine embodies two central precepts: the right to fair warnining of the effect of a governing statute..and the guarantee against standardless law enforcement.."Id. at 138. "The general rule is that the constitutionlity of a statutory provision being

attacked as void for vagueness is determined by the statute's applicability to the particular facts as issue..to do otherwise, absent the clear appearance that the statute in question intrudes upon fundamental guarantees, particularly First Amendment freedoms, would be to put courts in the undesirable position of considering every conceivable situation which might possibly arise in the application of the statute." Id. at 138-39 quoting Rocque v. Farricielli, 269 Conn. 187, 204-05(2004). In Commonwealth v. Slome, which dealt with the certainity and definiteness required by art. 12 of the Declaration of Rights of the Constitution of Massachusetts and because possible lack of certainty and definiteness is a violation of due process clause. The court stated:

> A statute creating a crime must be sufficiently definite in specifying the conduct that is commended or inhibited so tha that a man of ordinary intelligence may be able to ascertain whether any act or omission of his, as the case may be, will come within the sweep of the statute. It must fix with a reasonable degree of definiteness what it requires or prohibits. It should furnish a definite standard as a guide to determiner what it denounces and condemns. A citizen is entitled to protection from prosecution unless the statute on its face penalizes the particular conduct with which he is charged. One ought not to be compelled to speculate at his peril as to whether a statute permits or prohibits any action which he proposes to take. If the standard of guilt prescribed by a statute is so variable, vague or uncertain that it is useless as a measure of criminal liability, then the statute must be struck down.

75 N.E.2d, 517, 519(1947) citing Commonwealth v. Daniel O'Connell 's Sons, Inc., 281 Mass. 402(1933); Connally v. General Construction Co., 269 U.S. 385 (1926); Cline v. Frink Dairy Co., 274 U.S. 445 (1927); Lanzetta v. State of New Jersey, 306 U.S. 451(1939). In People's Rights Organization Inc., v. City of Columbus, 152 F.3d 522, the complaint alleged memebers were unable to determine whether such firearms and parts are assault weapons under Columbus ordinance and failed to register(6th Cir. 1998). The Appeals Court affirmed in part and reversed in part

the ruling of the district court. They upheld the grandfather provisions almost wholly, while invalidating each definitions of assault weapons contained in the ordinance. It is noteworthy the city's ordinance sentencing for first time offenders is relatively small when compared to Massachusetts sentencing for first time offenders of assault weapons and/or large capacity feeding devices. "A fundamental component of due process that a law is void for vagueness if its prohibitions are not clearly defined," the Supreme Court in *Grayned v. City of Rockford* explained that vague laws offended several important values:

> first, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warnings. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.

408 U.S. 104, 108 (1972). The court also used the two-fold test for the vagueness doctrine, 1) does the law give 'a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly' and 2) does the law provide reasonable standards to law enforcement authorities to ensure against arbitrary and discriminatory application. *Id.* See *Jordan v. DeGeorge,* 341 U.S. 223, 231-232 (1951)(the Supreme Court set forth the test for vagueness, holding that "the test is whether the language as to the proscribed conduct conveys sufficiently definite warnings as to the proscribed conduct when measured by common understanding and practices.")

In *Eleazor Smith v. People of State of California,* 361 U.S. 147 (1959) A Los Angeles ordinance disposed with the element of scienter, knowledge of contents of book by bookkeeper, imposing strict liability for possessing obscene material which inhibited constitutionally protected expression and that it could not stand because of its tendency to inhibit constitutionally protected expression.

attacked as void for vagueness is determined by the statute's applicability to the particular facts at issue..to do otherwis appearance that the statute in question intrudes upon fundamental guarantees, particularly first amendment freedoms, would be to put courts in the undesirable position of considering every conceivable situation which might possibly arise in the application of the statute." *Id.* at 138-139 quoting *Rocque v. Farricielli*, 269 Conn. 187, 204-205 (2004).

In *Commonwealth v. Slome*, which dealt with the certainty and definiteness required by art. 12 of the Declaration of Rights of the Constitution of Massachusetts and because possible lack of certainty and definiteness is a violation of due process clause.

The court stated:

> A statute creating a crime must be sufficiently definite in specifying the conduct that is commended or inhibited so that a man of ordinary intelligence may be able to ascertain whether any act or omission of his, as the case may be, will come within the sweep of the statute. It must fix with a reasonable degree of definiteness what it requires or prohibits. It should furnish a definite standard as a guide to determine what it denounces and condemns. A citizen is entitled to protection from prosecution unless the statute on its face penalizes the particular conduct with which he is charged. One ought not to be compelled to speculate at his peril as to whether a statute permits or prohibits any action which he proposes to take. If the standard of guilt prescribed by a statute is so variable, vague or uncertain that it is useless as a measure of criminal liability, then the statute must be struck down.

75 N.E.2d 517, 519 (1947) citing *Commonwealth v. Daniel O'Connell's Sons, Inc.,* 281 Mass. 402 (1933); *Connally v. General Construction* Co., 269 U.S. 385 (1926); *Cline v. Frink Dairy Co.,* 274 U.S. 445 (1927); *Lanzetta v. State of New Jersey*, 306 U.S. 451 (1939). In *People's Rights Organization Inc., v City of Columbus,* 152 F.3d 522, the complaint alleged members were unable to determine whether such firearms and parts are assault weapons under Columbus ordinance and failed to register(6th Cir. 1998). The Appeals Court affirmed in part and reversed in part the ruling of the district court. They upheld the grandfather provisions almost wholly, while invalidating each of the definitions

Almost thirty years ago, Chief Justice Hughes declared:

> It is no longer open to doubt that the liberty of the press and of speech is within liberty safeguarded by the due process clause of Fourteenth Amendment from invasion by state action. It was found impossible to conclude that this essential personal liberty of fundamental rights of person and property.

*Eleazor Smith* at 149-150 quoting *Near v. State of Minnesota ex rel. Olson,* 283 U.S. 697 (1931). "It is also too familiar for citation that such a doctrine of this court in respect to these freedoms, ever since. And it also requires no elaboration that free publication and dissemination of books and other forms of the printed word furnish very familiar applications of these constitutionally protected freedoms." *Smith* at 150. Justice Hughes famous quote, now 80 years ago no doubt rings clear in all jurisdictions. In light of the recent *McDonald* holding that the Second Amendment is fully applicable to all states via the Fourteenth Amendment, one may reasonable draw the inference that Justice Hughes's statement about First Amendment freedoms of speech and press is and should be construed as applying to Second Amendment. *McDonald v. City of Chicago, Ill.,* 130 S. Ct. 3020 (2010). While the First Amendment freedoms have long been accepted through the Fourteenth Amendment, the Second Amendment is in infancy. Justice Hughes's statement logically applies to the Second Amendment. Additionally, "it has been stated that the usual doctrine as to the severability of constitutional and unconstitutional applications of statutes may not apply where their effect is to leave standing statute patently capable of many unconstitutional applications, threatening those who validly exercise their rights of free expression with expense and inconvenience of criminal prosecution. *Thornhill v. State of Alabama* 310 U.S. 88, 97-98 (1940)("A criminal law is overbroad if it punishes activities which are constitutionally protected). Using these concepts as guides logically seems to

allow exercise of Second Amendment right of possession in one's home without the burden of criminal prosecution. Yet, it appears that this Commonwealth has almost unlimited power to regulate the possession of firearms and prosecutions. Which cannot stand in regards to the Second Amendment right, moreover one would also consider that possession of weapons lawful purchased from a licensed arms dealar, kept inside one's home would be considered a perfectly reasonable exercise of 'core' Second Amendment rights protected by the U.S. Constiution.

In Springfield Armory v. City of Columbus the court noted that a criminal statute may be facially invalid even if it has some conceivable application. 29 F.3d 250, 251-52(6th Cir. 1994) (ordinance found unconstitutionally vague under due process of 5th and 14th Amendments, where the provisions desribing the nature of weapons subject to a ban on possession, manufacture or sale or transfer and identified the prohibited weapons by specifically listing them by manufactureer and model number, and in addition prohibited other models by the same manufacturer with same action design having slight modifications or enhancements, the court holding that consumers of ordinary intelligence could not be expected to research the ancestry of a weapon in order to determine whether one they possess or desire to possesshhas been banned as modified verison of a listed weapon, and that the consumers of ordinary intelligence could no be expected to reasearch the ancestry of a weapon in order to determine what they possess, thus entire statute void). The appeal challenged the validity of city ordinance banning certain assualt weapons on the basis of manufacturer and model number, as well as weapons made by the same company with slight modifications. The court stated that vague laws offend several important values, among which are that a person of ordinary intelligence ought to have the opportunity to know what is prohibited, and that standards must be reasonably clear in order to ensure that the state power will be exercised only on behalf of policies forming the foundation of the

legislation. *Finding that several of the weapons banned under the ordinance were equivalent to many that were not banned, mainly because of difference in manufacturer or model number, the court found that the ordinance was fundamentally irrational and impossible to apply consistently by prospective purchasers and those charged with applying the law. The court explained that, by outlawing assault weapons by brand name without including similar weapons of the same type, function, or capability, the ordinance did not achieve the stated purpose of getting assault weapons off the streets. Moreover, the court stated that the ordinance expressly sought to ban 'assault weapons' but in fact banned only an arbitrary and ill-defined subset, without providing either an explanation why those were chosen, or a reasonable means for the consumer, dealer, or court and law enforcement officers to determine which of the remaining similar weapons were prohibited.* Without addressing whether the ordinance constituted an unconstitutional bill of attainder, the court found the ordinance irrational in banning certain weapons on the basis of the identity of the manufacturer, while permitting the sale and possession of virtually identical models made by other manufacturers. Observing that, in banning assault weapons by simply listing forty-six weapons by brand name and model number, the prohibition also included a ban on any other "model by the same manufacturer" with the "same action design" that have "slight modifications or enhancements," the court found no guidance for determining what would constitute a slight modification of the same action design. Finding no discernible purpose for the slight modification requirement, the court stated that manufacturers and consumers were without adequate notifications of the degree of modification necessary to fall within or outside of the provision, particularly considering the innumerable ways that a weapon can be designed, modified, or otherwise altered. The

court stated that, even if the term 'slight' did not render the provision void, the term 'modification' did, because it would have required ordinary consumers to know the development history of a weapon in order to determine whether it was banned, considering that an identical weapon made by a different manufacturer. Id. Moreover, in Hoffman Estates v. Flipside Hoffman Estates Inc., the court stated, "we must keep in mind that the degree of vagueness that the Constitution tolerates as well as relative importance of the fair notice and enforcement depends in part on nature of nactment...and when criminal penalties are at stake, for instance, a relatively strict test is warranted. 455 U.S. 489, 498-99(1982). The Supreme Court is quoted as "perhaps the most important factor affecting the clarity that Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights," yet the court noted that this was no present in Hoffman. In light of the Heller and McDonald holdings, a protected right is present in John Cassidy's case.

In People's Rights Organization, the plaintiffs also contend the statute is unconstitutionally vague because it fails to provide sufficient information to enable a person of common intelligence to determine whether a particular firearm is included within its prohibitions. 152 F.3d 522. The Plaintiff pointed to certain phrases of ordinance and pointed out four alternatives and that it is unclear which is actually correct. The court stated, "as currently written, the provision is a trap for the unwary." Id. The Court further explained that any semiautomatic rifle that accepts a detachable magazine will accept a detachable magazine of any capacity that exists as it is the magazines, not the rifle that determines capacity, therefore anyone who possess a semiautomatica center fire rifle or

carbine that accepts a detachable magzine is subject to prosecution so long as magazine exists with a capacity of twenty plus rounds, and since no scienter is required an owner's complete lack of a magazine's existence is of no consequence. Id. at 535-36. Additionally, capacity of a detachable magazine is limited only by availablity of a large capacity magazine. All owners of semiautomatic, center fire rifle(s) or carbine(s) with detachable magzines are in jeopardy of prosecution if a compatible large capacity magazine is discovered or manufactured. Presumbly this was not the intent of city when it passed the ordinance or it could have simply banned possession or transfer of any semiautomatic rifle which accepts a detachable magazine. Id. at 536. Massachusetts's gunregulations similarly define assault weapons and large capacity as the above Columbus ordinance did, however, there is language, in Massachusetts's scheme, noting that the large capacity detachable magzine must be in possession of the owner, yet one who purchases guns legally out of state and moves in Massachusetts would not have 're-regulations' making once legal possession to now be considered illegal based solely on capacity and how the weapon or device's characteristics are NOW defined statutorily. See Staples, 511 U.S. 619(in order to convict defendant for possession of an unregistered firearm the government must prove that the defendant knew of the characteristics of the firearm made it subject to provisions of the statute). The clarifying language of Massachusetts's gun regulation is contained in a completely seperate area which is 501 CMR 7.00 and nothing in any of the sections of ch. 140 reference the CMRs. The language of both Massachusetts's and Columbus's ordinance in defining large capacity and detachable magazines are almost exactly the same; M.G.L. ch. 140 §131 3/4 which is the roster of large capacity rifles, shotguns, firearms and feeding devices expressly states and calls for the statutory definition of large capacity rifles, shotguns, firearms and feeding devices as defined in §121. The definitions contained in §121, as previously stated, are similar to the provisions of the Columbus ordinance which where struck down. Ending with this secondary designation of "large capacity" did no exist in Massachusetts until 1998.

The unusual nature of the instant case means it is not the kind of case that the Legislature or Congress had in mind when enacting the firearm licensing statutory scheme. "it is a central tenet of our constitional law that, as a matter of due process, a criminal statute that fails to give a person of ordinary intellgence fair notice that his contemplated conduct is forbidden should be deemed void for vagueness. Opinions of Justices, Etc., 393 N.E.2d 313 (1979), citing Colautti v. Franklin, 439 U.S. 379, 390(1979). "And where uncertainty engendered by a criminal statute threatens to restrain the exercise of constitutionally protected rights judicial relief is particularly appropriate. Id. at fn. 3 citing Smith v. Goguen, 415 U.S. 566, 573(1974)(emphasis added by author). Grayned v. Rockford, 408 U.S. at 109, and other cases citied therein. "The Presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than the Republic." Landgraf v. USI Film Prods., 511 U.S. 244, 265(1994). The anti-retroactivity priniciple was of such concern to the founding fathers that it was safeguarded in various provisions of the Constitution, including the Ex Post Facto Clause, prohibitions on Bills of Attainder, and The Due Process Clause's protection of the interests in fair notice and repose:

> These provisions demonstrate that retroactive statutes raise concerns. The Legislature's unmatched powers allows it to sweep away settled expectations suddenly and without individualized consideration. Its responsivity to polical pressures poses a risk that it may be temtped to use retroactive legislation as a means of retribution against unpopular groups or individuals....it restricts governmental power by restraining arbitrary and potentially vindictive legislation.

Landgraf, 511 U.S. at 266-67. FN5.

---

FN5: Plaintiff notes gun owners make up a large 'group' of U.S. citizens, potentially popular or unpopular 'groups.'

Where the new statute would have a genuinely retroactive effect, i.e., where it would impair rights a party possessed when he or she acted, increase liability for past conduct, or impose new duties with respect to transactions already completed, the traditional analysis teaches that the statute does not govern absent clear congressional intent favoring such a result.

Id. at 280. To establish a procedural due process violation, a constitutionally protected freedom or liberty interest must be infringed without adequate procedural safeguards. See Lehr v. Robertson, 463 U.S. 248, 256 (1983). Ignorance of the law may excuse criminal behavior where liability attaches to a wholly passive act. Lambert v. California, 355 U.S. 225, 228 (1957). The Lambert court held that a law which imposed strict liability upon convicted felons for mere presence in a municipality was constitutionally infirm because, without forewarning, it punished conduct that a reasonable person ordinarily would not consider to be criminal. Lambert, supra. In **Commonwealth v. Ronald Norling**, 16 Mass. L. Rptr. 484, 2003 WL 21781388, the defendant was charged with several counts of unlawful possession of large capacity weapons which he had purchased and possessed while in Massachusetts and under the former licensing scheme(2003). Mr. Norling's license expired due to the change in Massachusetts' licensing scheme and his once legal possession was now illegal. This case makes clear that the Lambert exception applies to 1) criminal offenses, 2) which involve only completely passive conduct and 3) where a reasonable person in the defendant's position would not have known the conduct might be illegal. The second prong of Lambert's three prong test was elaborated on in United States v. Freed, 401 U.S. 601, 608(1971)(explaining Lambert and noting that "being in Los Angeles is not per se blameworthy."). Additionally, the Staples case explicitly rejected the propopistion that ordinary firearms are the type of dangerous devices which should be regulated by 'public welfare' statutes. Staples at 609-15.

In United States v. Christopher Meade, 175 F.3d 215(1st Cir. 1999), the defendant was convicted by jury in the United States District Court for the District of Massachusetts of possession of a firearm which was unlawful because defendant was subject to judicial anti-harassment order and because

defendant had previously committed misdemeanor crime of domestic violence. "Firearm possession is an act sufficiently innocent that no one could be expected to know that 'they' would violate the law by possessing a gun and without more than simple possession it is not the kind of activity comparable to possession of hand grenades, narcotics or child pornography." Meade, at 226 quoting Staples at 610-612. The Norling court's closing discussion before allowing the defendant's motion to dismiss is as follows:

> The case at bar presents a novel issue in that it involves a once-legal possession of firearms that was subsequently rendered illegal, not by any affirmative conduct but by the defendant's failure to re-register his weapons in accordance with statutory amendments. Like the defendant in Lambert, who failed to register as a felon with the Los Angeles chief of police, the Defendant's continued possession itself constitues enitrely passive omission. Lambert, 355 U.S. at 228-29. Although courts have opined that possession itself constitutes active conduct, the conduct at issue in this case is not the original possession or the possession after some change in the defendant's status from an ordinary citizen, but continued possession of firearms in the absence of any intervening event that would have alerted a reasonable person to the illeglaity. Moreover, the Defendant did no know or have reason to know that his omission violated the law. The Commonwealth presented to the Court no evidence that the Defendant was notified of the changes in the licensing system or the new expiration and registration dates with which he should have complied. Nor can this Court find implied notice based on a change in Defendant's circumstances. Unlike the defendants in Hancock, Meade, and Mitchell, all of whome failed to inquire about the lawfulness of their gun ownership after they were convicted of crimes of domestic abuse or subjected to abuse-prevention orders, the Defendant in this case, committed no crimes that would have given him or any other reasonable gun owner cause to check on the stats of his registration. Hancock, 231, F.3d at 565, Meade, at 226, Mitchell, 209 F.3d at 322-23. This is a case in which the defendant omitted to act by failing to comply with a law of which he had no notice or reasonable knowledge. Pursuant to the Fourteenth Amendment, as interpreted by Lambert and its progeny, this Court concludes that the Defendant's violation of G.L. c.269 §10(m) was justifiably excusable and that the defendant's further prosecution offends due process.

Norling, 16 Mass. L. Rptr. 484 *4.

Statutes concerning a common topic should, of course, be read as a whole to produce an internal consistency and to effectuate the presumed intention of the legislature. See

Dowling v. Registrar of Motor Vehicles, 425 Mass. 523, 525(1997). To this end where, by amending an existing statute, the Legislature changes some but not all of the provisions of an earlier statute, the later enacted provisions must be read together with the earlier provisions left unchanged as if they originally had been enacted as one. See 1A N.J. Singer, Sutherland Statutory Construction § 22.32-22.35, at 282-300 (5th ed. 1992). Looking to the history of M.G.L. ch. 269 §269(m) one finds St. 1974 ch. 649 §2 approved July 30th, 1974 and by §3 made effective January 1, 1975 rewrote the section, which prior thereto read: "the court may, if the firearm or other article was lost or stolen from the person lawfully in possession of it, order its return to such person, and where it has been the finding of the court that a person has been guilty of unlawful possession of a firearm, but makes the further finding that such possession of a firearm was in ignorance of the law, the court may order the return of said firearms to its owner upon his compliance with those regulations relative to the establishment of lawful possession." See also People v. Jimenez 8 Cal. App. 4th, 391, 10 Cal. Rptr.2d 281(1992)(in criminal prosecution for violating state's assault weapons ban, the court recognized that proof of lawful possession of a banned weapon could serve as a defense to conviction, but the burden rested with the defendant to show that the gun had been properly registered or was otherwise lawfuly possessed). This section has been removed from §10 for 35 years yet it still embodies the Legislature's original intent which was to provide private possession of weapons and to allow those who were ignorant of the law PROTECTION.

With both the Norling holding and looking to the history of the statute as guidance, one finds that in the instant case the illegal possession of firearms was in fact ignorance of the law and presently John Cassidy meets all requirements for possession of the weapons in Massachusetts and thus it would seem reasonable that the weapons be returned to him without any finding of guilty or that the weapons be relesed to a designated person of Mr. Cassidy's choosing that meets the requirements for possession AND he be released immediately from state jail.

Gun Owner's Action League Inc. et al, v. Jane Swift et al, 284 F.3d 198 (2002)(Plaintiff allege new restrictions on

guns classified as large capacity weapons and increased penalties for unlicensed possession are unconstitutional because of the vagueness of important definitions within the act). Here the Plaintiffs allege almost the sme facts from Peoples Rights Organization v. City of Columbus, supra. The court differentiated People's Rights Organization from the Gun Owner's Action Legaue case in that in Massachusetts there is a third option, obtaining a license for their weapons. This being true

and in fact ch. 140 provides many exemptions to a firearm identifcation card (FID) or license to carry (LTC), yet persons of ordinary intelligence may find the enormous bredth of statutes and texts overwhelming to decipher what one needs not to be in violation.

Ch. 140 §129C is the application of §128B ownership and possession, however the last sentence in 129C is

rather unsettling. It is quoted as "nothing in this section shall prevent any person from being prosecuted for any violation of this chapter." This is obviously a point of confusion for any layman reading the ownership and possession guidelines with enumerated exemptions yet the last sentence purports to still allow prosecution; it is plainly arbitrary and capricious which a normal reading of the last sentence in the statute will show. Yet this is just the beginning of overly broad guidelines and vagueness. The roster for large capacity specifically lists many weapons by make and model yet the list explicitly states that this list does not include all weapons deemed large capacity and notes that large capacity weapons shall apply to all semiautomatic weapons equipped with large capacity feeding devices not listed and can be quoted as "weapons not listed on this roster may also be large capacity weapons if they are semiautomatic and are capable of accepting or readily modifiable to accept a large capacity feeding device." The words 'may also be' and 'readily modifiable to accept' are plainly vague words. See *People's Right Organization* at 535-536. Also the large capacity roster provides a fairly confusing purpose. Does it outlaw possession of weapons listed or does it allow possession of listed weapons with the proper license? A reading of the text accompanied with the roster encompasses "all firearms that are semi-automatic and capable or readily modifiable to accept a large capacity feeding device." This appears to be encompassing all semi-automatic firearms that are capable or readily modifiable to accept more than ten rounds, yet fails to mention if these devices are outlawed by being on the list or can be legally owned. Additionally, the word 'assault weapon' as defined in c. 140 § 121 "includes, but not limited to any of the weapons, or copies or duplicates of the weapons, of any caliber known as: (i) Avtomat Kalashinikov (AK)(all models); (ii) Actions Arms Israeli Military Industries UZI and Galil;

(iii)Beretta AR70 (Sc-70); (iv)Colt AR-15; (v)Febrique National FN/FAL, FN/LAR and FNC; (vi)SWD m-10, M-11, M-11/9 and M-12*; (vi)Steyr AUG*; (vii) IN TRATEC TEC-9, TEC-DC9 and TEC-22;(viii) revolving cylinder shotguns, such as or similar to the Street Sweeper and Striker 12.." (typographical error in statute which contains two Roman Numerials (vi)). §121, as quoted, lists several models by name and includes in the prohibited all other calibers of the same model, yet the exact same model and manufacturer, along with roster that §121 specifically lists as prohibited. Not to mention the large capacity lists and contains numerous more 'dangerous' or higher caliber weapons than some outlawed in Ch 269 and §121 of Ch.140. A point of confusion for any reader to find weapons on an approved roster which does notmmention if the weapons listed are legal with proper license or outright illegal. The illegality is based upon definitions by another statute in the same reglatory scheme to be assault weapons, which Ch. 140 §131M outlaws the, sale, possession or transfer of assault weapons not possessed on 9/13/94. Moreover, if one is not a licensed gunsmith, n licensed under §122 assault weapons cannot be possessed unless one is a law enforcement officer current or retired. This provides moe confusion that the same weapons listed in one section of the reglatory scheme are outlawed only to seemingly be legal in other sections. An ambiguity either patent or latent.

Turning next to the approved firearms roster which lists approved models and specific manufacturers of firearms yet many caliber firearms listed on roster are manufactured and sold by different gun makers in varying models but are not listed on the roster even though they are identical to the ones listed on the roster . In GOAL v. Jane Swift the court stated the statute provides for citizen input into process of promulgating and updating the roster and any person may petition to the secretary to place weapons on the list or removal, it is an unreasonable burden to place on citizens

to sort through the countless weapons lawfully sold to the public and compare them to ones on the roster to seek addition or to add an almost identical weapon to the list that are not currently 'approved.' Swift at 208. Indeed both rosters are almost laughable to consider that the millions of guns manufactured and sold throughout this country can be dwindled down to a few pages of 'approved' firearms which one can possess in Massachusetts. In fact some firearms are no listed as approved at all or even considered because the manufacturer did not provide the firearm in all available colors it is offered in(that is to say an identical firearm will not be sold in Massachusetts as legal/ approved because it is offered in varying hues while the firearm is functionally the same except for its appearance), thus the firearm will notbe added to the roster. The ordinary man of common intelligence nor the most avid gun enthusiast could not keep up with the thousands of new guns manufactured annually or the modifications available to guns already in circulation or even to be able to note the differences between different manufacturers of the same caliber rifle or handgun. People wishing to simply possess weapons inside their home, exercising their Second Amendment right, have a burden of understanding all the statutes in regards to possession and carrying because of the statute requirement of a class A license to carry or possess a large capacity weapon and a rather catchy licensing system. Although it is certain there are weapons capable of accpeting nine or less rounds of ammo, the majority of handguns and firearm (s) commonly come equipped with magazines which would fall into category of a large capacity weapon. Requiring additional registrations and fees to possess a weapon solely inside one's home and completely protected by the United States Constitution and the Second Amendment. See McDonald. The man of ordinary intelligence and common sense could plausibly have trouble understanding if he is

protected to possess a weapon capable of accepting ten or more rounds of ammunition in his home as a constitutional right or surely have some confusion would arise if a handgun (non-revolver) that was prudently purchased by using the approved handgun roster and possessed within his home legally only to be arrested and prosecuted for possessing a large capacity weapon because his weapon came standard with magazine capable of holding ten or more bullets, thus what he thought was lawful and innocent turns out to be 'knowingly' possession of a large capacity weapon subjecting him to varying c.269 §10(m) sanctions. By requiring a class A LTC and not simply a FID in order to possess a large capacity weapon within one's home creates an unnecessary burden on those wishing to exercise their Second Amendment right. See *McDonald* and *Heller*. Moreover, the large capacity roster promotes further confusion when the approved firearms roster is plentiful with weapons capable of accepting a magazine which holds ten or more bullets yet not listed on large capacity roster. The rosters appear to be irrational and arbitrary in its chosen enumerated weapons and especially in light of the severe sentencing guidelines and punishment upon conviction of possession of large capacity or simple possession of a firearm when the possession of the weapon(s) is solely within one's home. In conclusion of *GOAL v. Swift* the Court states, "Like many citizens trying to comply with a complex regulatory scheme, the plaintiffs here describe difficulties in understanding the act. *Swift* at 216. This is an understatement, Massachusetts's gun licensing scheme is esoteric at best. The court's analysis states, "Both clarifying language and the roster assist law enforcement officers and laymen in interpreting the statute" is wrong. *Id.* at 208. The language and rosters only create confusion, unreasonable regulations and restrictions of a fundamental

right, and consumes large amounts of resources and time for any court or law enforcement officer seeking to enforce the regulations or any layman seeking to exercise their rights.

The approved handgun roster, like the large capacity roster, lists guns by manufacturer and model/caliber. The list is by no means extensive and there are many weapons not listed on the approved roster that are exactly the same as weapons listed on the roster, however they are made by a different company and are not on the list and yet to be added by petition of a citizen. See *GOAL v. Swift,* at 208. This roster is not as confusing on its face as the large capacity roster; rather the approved handgun roster is troubling by the guns it lists as approved.

The purpose of Massachusetts's Executive Office of Public Safety is undoubtedly to stop or at least diminish gun violence and to prevent guns from entering the hands of criminals. Yet the FBI recently published its crime data which suggests that violent crime and firearm violence is actually down, while firearm ownership is at an all time high. See also *More Guns, Less Crime: Understanding Crime and Gun Control Laws*, John R. Lott, Jr. 1998.

The approved hand gun roster consists of varying revolvers and handguns. To be specific, forty-two percent of the weapons on the roster are revolvers. Of the remaining non revolver style guns on the roster thirty-eight percent are standard 'large capacity' according to Massachusetts statutory definition. The following statistics were taken from the U.S. Department of Justice, Marianne W. Zawitz, *Guns Used in Crime*, Bureau of Justice Statistics Selected Findings Firearms, Crime, and Criminal Justice (July 1995). According to the National Crime Victimization Survey, almost 43.6 million criminal victimizations occurred in 1993, including 4.4 million violent crimes of rape and sexual assault, robbery, and aggravated assault. Of the victims of these violent crimes, 1.3 million (29%) stated

that they faced an offender with a firearm. The FBI's Supplemental Homicide Reports show that 57% of all murders in 1993 were committed with handguns, 3% with rifles, 5% with shotguns, and 5% with firearms where the type was unknown. The 1991 Survey of State Prison Inmates found that violent inmates who used a weapon were more likely to use a handgun than any other weapon; 24% of all violent inmates reported that they used a handgun. Of all inmates, 13% reported carrying a handgun when they committed the offense for which they were serving time. Research found that most criminals prefer guns that are easily concealable, large caliber and well made. The Bureau of Alcohol, Tobacco, and Firearms (ATF) estimates that from 1899 to 1993 about 223 million guns became available in the United States, including over 79 million rifles, 77 million handguns, and 66 million shotguns. Over 40 million handguns have been produced in the United States since 1973 and it is thought more than 200 million handguns are owned in the United States today. The most frequently reported stolen guns are .38, .22, and .357 caliber revolvers with twenty percent being .38s and .22 and .357 making up twenty-two percent. Additionally, in 1993 a sample of felons were asked about the handgun they preferred and twenty-nine percent answered .38 caliber, twenty percent a .357 and sixteen percent a .22 caliber. Finally, from 1982 to 1993 of the 687 police officers who were killed by firearms other than their own guns twenty-five percent were killed by a .38 and twelve percent by a .357. In 1993, prior to the passage of the assault weapon ban, the ATF reported that about one percent of the estimated 200 million guns in circulation were assault weapons. In 1991 the Bureau of Justice Statistics Survey of State Inmates recorded that about eight percent of inmates reported they had owned a military-style weapon such as an AK-47, AR-15, an Uzi or M-16. Less than one percent said that they carried such a weapon when they committed

the incident for which they were incarcerated. A Virginia inmate survey conducted between November 1992 and May 1993 found similar results, about ten percent of the adult inmates reported that they had possessed an assault rifle, but none had carried it at the scene of a crime. These statistics seem to suggest that criminals or potential criminals prefer smaller, concealable weapons that are large caliber. That description seems to fit that of a revolver. If Massachusetts's Executive Office of Public Safety takes criminals' possession of weapons as a threat to public safety and is attempting to curb possession of weapons by criminals, it should take into account that most criminals prefer a concealable weapon, with revolvers being the most concealable and with a revolving cylinder(in lieu of a detachable magazine) the spent casing is not ejected from the gun, rather it sits in the cylinder until the operator takes the spent casing out, which would seem to only leave less evidence for law enforcement in solving violent crimes. However, the majority of weapons on the approved handgun roster are ideal for criminal possession and mischief, and a great deal of the revolvers on the roster have a barrel of less than three inches in length, which is widely known and accepted by police as having no lawful purpose due to inaccuracy and poor firing capabilities(aka 'junk gun'). With these statistics in mind, the question is raised about the exact methodology used when preparing Massachusetts's roster or how it can be legitimately helping to deter criminal possession and violent crimes. The approved handgun roster seems at best an attempt to outlaw an ill defined set of weapons and provides no real understanding on why the weapons listed were chosen in the first place. See *Citizens for a Safer Community v. City of Rochester*, 164 Misc. 2d 822, 627 NYS2d 193(1994)(City ordinance regulating semiautomatic rifles and shotguns, when possessed with ammunition-feeding devices as specified, was lawful exercise of police power and did

not interfere with right to bear arms; however, ordinance violated equal-protection clause by attempting to make criminal the sale or possession of specific guns of some manufacturers, while allowing possession of essentially identical guns made by others); *But Cf. State v. LaChapelle*, 451 N.W.2d 689 (1990)(held that statute prohibiting possession of short rifle, short shotgun or machine gun did not violate the right to bear arms amendment, reasoning that amendment did not prohibit reasonable regulation regarding the possession of firearm, and that the statute was a valid exercise of the state's police power in view of the fact that the prohibited firearms were adapted to and commonly used for criminal purposes).

In July 2010 the Executive Office of Public Safety prepared a report titled "An Overview of Firearms Related Offenses Arraigned in Massachusetts Courts Between 2006 and 2008." The report was written by Mica Astion, Shelley Penman and Marc Germain and issued by the Office of Grants and Research. This thirteen page report analyzes Massachusetts Firearms Related Offenses over a three year period and encompasses 26,723 firearm offenses.

The most astonishing statistics are as follows:

- More than half, 56%, of firearm related charges were dismissed or Nol Prossed
- Only 13% of charges resulted in a term of commitment
- The report found that as the age of the defendant increases, the likelihood of receiving a term of commitment decreases
- The four firearm offenses: FID Card, Possession of Firearm without permit, possession of firearm, and firearm violation(other), accounted for 75% of all the charges or for 20,039 of the entire 26,723 firearm offenses

These statistics tend to suggest that Massachusetts's gun licensing scheme is at best arbitrary at enforcing its gun offenses. The ill defined rosters only further frustrate and confuse gun owners or potential gun owners, while allowing criminals to possess firearms regardless of the illegality as the criminal will violate the law regardless of the prohibitions. Furthermore, the fact that from 2006-2008 half of the firearm offenses where not even prosecuted further suggests the dysfunctional and disproprtionate licensing scheme in place.

In Commonwealth v. Arthur Williams, 479 N.E.2d 687, the defendant was arrested and charged with sauntering and loitering and drinking alcohol on a public way, on appeal the court determined the statute in question was void on vagueness grounds and reversed in favor of defendant(1985). Noting that due process requires a criminal statute to give sufficiently clear notice of prohibited conduct the court also acknowledge that "if the Legislature fails to set forth criminal guidelines to govern law enforcement, a criminal statute may permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections," Kolender v. Lawson, 461 U.S. 352, 358 (1983); and that "this court has expressed concern that it would certainly be dangerous if legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained and who should be set at large." Commonwealth v. Bohmer, 374 Mass. 368, 372(1978)(emphasis added by author); See e.g. Bouie v. City of Columbia, 378 U.S. 347(1964)(the issue of notice in the constitutional sense, customarily centers around whether a law explains with suffieient clarity the conduct that it purports to criminalize). The concern that the courts expressed in the above cases seem to be 'spot on' in the firearm offenses the study observed. It appears from the statistical analysis of Massachusetts's

firearm offenses from 2006-2008 that 'net' which caught potential offenders over the three years was indeed left to the court to step inside and say who could rightfully be detained and who should be set at large. See *City of Cambridge v. Phillips*, 612 N.E.2d 638 (Mass. 1993)(Principle underlying void for vagueness concept is that vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on *ad hoc* and subjective basis. U.S.C.A. Const.Amends. 5, 14); *Commonwealth v. Abramms,* 849 N.E.2d 867 (Mass. App. 2006)(Court acknowledging that in addition to fixing minimum standards for providing notice of the conduct proscribed by particular laws, the vagueness doctrine also prohibits such imprecision as might give rise to arbitrary enforcement of laws; consistent with this principle, legislatures are constitutionally required by Due Process Clause to set forth minimum guidelines for the enforcement of criminal statutes to avoid a standardless sweep that allows policemen, prosecutors, and juries to pursue their own personal objectives. U.S.C.A. Const. Amend. 14.)(Per Gelinas, J with one judge concurring in result).

In the 1999 case of *Saenz v. Roe,* Justice Stevens, writing for the majority, said that the "right to travel" also has a component protected by the Privileges or Immunities Clause of the Fourteenth Amendment.

Justice Stevens stated:

> Despite fundamentally differing views concerning the coverage of the Privileges or Immunities Clause of the Fourteenth Amendment, most notably expressed in the majority and dissenting opinions in the Slaughter-House Cases (1873), it has always been common ground that this Clause protects the third component of the right to travel. Writing for the majority in the Slaughter-House Cases, Justice Miller explained that one of the privileges conferred by this Clause is that a citizen of the United States can, of his own volition, become a citizen of any State of the Union by a bona fide residence therein, with the same rights as other citizens of that State.

526 U.S, 489, 503. The court also noted that by virtue of a person's state citizenship, a citizen of one state who travels in other states, intending to return home at the end of his journey(or in John's case his law school education) is entitled to enjoy the "Privileges and Immunities of Citizens in the several States" that he visits. Id. at 501 citing Corfield v. Coryell, 6 F. Cas. 546 (No.3,230)(C.C.E.D.Pa.1823)(Washington ,J., on circuit)("fundamental rights protected by the Privileges and Immunities Clause include the right of a citizen of one state to pass through, or to reside in any other state"). The Privileges and Immunities Clause of Article IV, as explained by The Supreme Court, the right to travel in the constitutional context embraces at least three different components. Saenz v. Roe, 526 U.S. at 500. 1)The right of free ingress and regress to and from neighboring states, 2) right of newly arrived citizen to same privileges and immunities enjoyed by other citizens of the same state and 3) the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in a second state. Id. at 500-04. In order to prevail on a Privileges and Immunities challenge, a plaintiff must demonstrate that the "State has; in fact, discriminated against out-of-staters with regard to the privileges and immunities it accords its own citizens." Connecticut ex rel. Blumenthal v. Crotty, 346 F.3d 84, 94 (2nd Cir. (2003).

In Commonwealth v. Clint A. Cornelius, 78 Mass. App. Ct. 413, 938(2010), the defendant was indicted for knowingly possessing firearms and ammunition. The defendant moved from Georgia to Massachusetts to live with his girlfriend who was attending school and brought with him a .45 caliber pistol with two large capacity magzines, a twelve gauge shotgun, and a .308 caliber semi-automatic rifle with four large capacity magzines and over 1500 rounds of ammunition. The court reported three questions of law which arose pretrial, one question being: "whether satisfaction of the firearm identification card exception set out in G.L. Ch.140 §129C(j) is a defense for a violation of G.L. ch. 269 §10(m)?" Subsection (j) of § 129C provides a sixty day grace period for certain persons, temporarily exempting them from the requirements of § 129C. Id. at 418 n.5. The court answered the question in the negative, stating that "large capacity feeding device is not among the list of items covered by G.L. ch. 140 §129C(j)." Id. at 419.

The court ruled that the sixty day grace period for new or returning residents is not a defense for violation of G.L. ch. 269 §10(m). Id. at 420. It appears plainly obvious that based on the holding in Cornelius, Massachusetts has discriminated against out of staters by not allowing a sixty day grace period for new residents who possess what the Massachusetts Legislature has secondarily designated as 'large capacity weapons and devies.' Instead lawfully owned firearms that fall into the statutory definition of large capacity weapons, as defined by Massachusetts, that are brought into Massachusetts by new resident(s) as part of their moving to a new state are in IMMEDIATE VIOLATION and subjected to mandatory minimum state jail sentence, at the discretion of the prosecuting attorney or arresting police officer. Moreover, it would seem to also place the issue of notice into question. As a new resident to the state at what point in time is a new resident privy to the statutory definitions of the state's regulations of firearms and Massachusetts's restrictive laws encompassing all guns? Massachusetts's gun licensing scheme begins in M.G.L. ch. 140 §121 and has many accompanying sections and subsections along with a few other corresponding chapters. § 121 sets out firearms sales and definitions for varying terms employed in the entire licensing scheme(chapters). §122B sets forth guidlines to be a licensed dealer of ammunition. This section sets out guidlines in five paragraphs, the third of these states, "the secretary of the Executive Office of Public Safety may establish such rules and regulations 'as he deemsnecessary to carry out the provisions of this section.' This sentence vests too much discretion to a licensing official and should be shot down as overly broad. §129B(1) pertains to FID cards, conditions and restrictions. The section provides how a FID card is issued and the restrictions. Subsection two provides the process in which an applicant completes to obtain a FID card. The licensing authority is statutorily mandated to notify the applicant if they are denied or approved forty days from the date of application. Once the application is filed, the colonel of the state police must recieve the application in seven days; from there the colonel has thirty days to advise the licensing authority if the applicant has any disqualifying criminal record.

This process appears to take, at most, thirty-seven days to complete. §129C is the application of §129B and lists numerous exemptions to a FID card. Subjection (j) allows a sixty-day grace period for possession of firearms without a FID card to new residents. The sixty grace period is of concern as it could take up to thrity-seven days for processing of a FID application. It appears quite possible that a new resident has roughly twenty-

three days to apply for a FID card before he/she violates the law. Gun owners should not expect severe regulations of guns, and twenty-three days seems to be a very small window in which to apply for a FID card. See Staples, supra. Therefore, the licensing scheme is overly borad and unreasonably infringes upon a fundamental right and accordinly should be stricken from the licensing process. Looking forward to possible future gun laws, this Plaintiff advocates for House Bill 1568 (Jan. 2011). In which the grace period is expanded to 180 days, which seems to suggest the Legislature has indeed noticed this and is seeking to extend the period to a much larger window. Perhaps even more concerning is the last sentence in § 129C, which states, "nothing in this section shall prevent any person from being prosecuted for any violation of this chapter." This plainly places a burden of guilty on all gun owners, even if a good faith effort to comply with regulations occurs, one is still able to be faced with an undue burden of litigation based upon a plain reading of this ending sentence. See Klein v. Leis, 146 Ohio App. 3d. 526, 767 N.E.2d 286 (1st Dist. Hamilton Co. 2002)("Affirmative defense contained in statute banning the carrying of concealed firearms did not save the staute from unconstitutionality based on unreasonable infringement of fundamental right under the State Constitution to bear arms; practical effect of statute was to impresmissibly impose a presumption of guilt until person being prosecuted was proven innocent."(emphasis added by author). Subsection (u) of ch. 140 §129C provides an exemption to a FID card if the applicant is eighteen years or older and at time of acquiring the firearm from a licensed dealer the nonresident holds a valid firearm license from his state of resident, provided that the licensing requirements of such nonresident's state are as stringent as requirements of the Commonwealth for a FID card. This is determinded by the colonel of the state police who publishes annually, a roster of those states which comply wit

with the provisions of this clause. The requirements for issuance of a FID in Massachusetts are enumerated in §129B(1)(i-ix), the exact same licensing requirements are also enumerated on the Bureau of Alcohol, Tobacco and Firearms form 4473. The ATF's 4473 form is the form required by all licensed dealers in Texas, along with a National Criminal Instant Check (NCIC) in order to purchase a firearm in Texas. This appears to satisfy §129C(u) and thus John Cassidy is exempt from obtaining a FID card. However, when this Plaintiff inquired about this exemption to the office of Colonel of the State Police in April 2011, he received a response dates May 12, 2011, which acknowledged the receipt of the inquiry of the approved state license roster and that the department was looking into this roster and would respond accordinly. No correspondence has been received to date, 2015. In addition, John Cassidy has followed up a second time concerning the inquiry matter once with a change of address, and re-requesting the information. And again a third time in August 2012, requesting the information under code of law, Massachusetts Public Records Law, M.G.L. ch. 66 §10, which statutorily requires the informatoin to be sent or alternatively a written explanation. This third inquiry was wholly ignored and the Office of the Colonel of the State Police violated its own statute. The requested documents likely do not even get created much less published as statutorily mandated. This Plaintiff has successfully completed the firearms safety course/class required by this Commonwealth. Also pertinent is a pamplet received in the course of completing said class. The pamplet is issued by the Executive Office of Public Safety and states: that the new Massachusetts's Gun Control Act takes effect on October 21, 1998 and effective June 1, 1998 all new firearm license applicants must complete a certified firearms safety course or hunter education course. As already discussed John Cassidy completed the firearms safety course on August 1, 2011. On September 24, 2000 John Cassidy completed a hunter education course which the pamplet also purports to accept as substitute. The latter course taken fifteen years ago then satisfies the requirement of a FID card in Massachusetts as well.

Chapter 140 § 131 deals with class A and B licenses and provides the restrictions and conditions of issuance of either classes of licenses. This section uses many words which are vague and do not provide a narrow, objective standard or

guidelines for officials and is thus overly vague in its application and enforcement. § 131(a) pertains to class A licens license to carry. In issuing a class A license to possess, rent, lease, borrow and carry firearms this subsection subjects the license to such restrictions, "..as the licensing authority deems proper," and "as it deems proper." These vague words vest too much authority in the licensing authority. They are neither narrow, definite nor objective and should be struck down as they offend due process. The issuing of a class B lice license, § 131(b), are subjected to the same vague wording "as deems proper." §131(d) only furthers the unbridled discretion that the license authority has in issuing a license to carry. This section sets out that anyone may apply for class A or B license to carry and the colonel .."may isue it if it appears the applicant is suitable person to be issued such a license, and that the applicant has good reason to fear injury to his person or propety.." The right to bear arms is a constitutionally protected right and can only be subject to narrow and objective prior restraints. An officials' personal views of someone's suitability to enjoy or exercise a constitutional right or of an applicant's moral virtue simply cannot be factors in regulating the exercise of a protected right. Assuming the Commonwealth is able to license the carrying of handguns in the interest of public safety, they cannot be in the business of judging people's character or forcing individuals to prove a sufficiently good reason for wanting to exercise something that is their right. Adherence to established prior restraint law, not an amorphous means-end scrutiny tier achieves this balance. § 131 3/4 pertains to the roster of large capacity rifles, shotguns, firearms and fedding devices, and states that all devices are defind in § 121. This section also notes the rosters are to be published not less than three times annually in newspaper of general circulation throughout the Commonwealth, yet this Plaintiff never saw such publications in the time he resided here, and it apears the rosters are simply posted for viewing and downloading on the government's website. Not actually posted and circulated as is required by the statute. § 131 covers permits to purchase, again the vague words "as deems proper" are used in this subsection. Of concern is that the permits to purchase are subjected to the following condition:

"if it appears such purchase, rental or lease if for a proper purpose and the permit itself is revocable at the will of the official." (emphasis added by author). When the exercise of a right is licensed and subjected to a prior restraint, that prior restraint must be permitted only pursuant to objective, well-defined standards that eliminate the exercise of personal discretion and "at the will of the official" is plainly subjective and with no defined standard.

For the aforementtioned reasons all convictions against John Cassidy shold be revoked. The gun licensing scheme in Massachusetts should be found unconstitutional under the Void for Vagueness Doctrine; while concluding that the gun permitting and licensing scheme is arbitrary and capricious in its enforcement which offends this PLaintiff's due process rights.

**III. THE SECOND AMENDMENT TO THE U.S. CONSTITUTION PROTECTS THIS PLAINTIFF FROM PROSECUTION FOR EXERCISING HIS RIGHT TO KEEP AND BEAR ARMS. FURTHERMORE, STRICT SCRUTINY IS THE APPROPRIATE LEVEL OF SCRUTINY TO BE APPLIED IN THIS CASE GIVEN IN HOME POSSESSION OF FIREARMS IS THE CORE OF THE SECOND AMENDMENT.**

The right to bear arms and the 2nd Amendment to the United States is fully applicable to the states through the 14th Amendment to the United States Constitution. U.S.C.A. Const. Amends. 2, 14. The Second Amendment to the Constitution of United States declares that since a well-regulated militia is necessary to the security of a free state, the right of the people to keep and bear arms may not be infringed. The right is a personal right, not being only to bearing arms in formal militia, but this holding does notcasst doubt on such longstanding regulatory measures as prohbitions on the possession of firearms in sensative areas such as schools and government buildings, or laws imposing condictions and qualifficationson the commerical sale of arms. McDonald v. City of Chicago, Ill., 130 S.Ct. 3010(2010)(Second Amendment right to keep and bear arms is

fully applicable to the States by virtue of the Fourteenth Amendment). The Second Amendment, like the First and Fourth Amendments, codified a pre-existing right. *District of Columbia v. Heller*, 128 S.Ct. 2783 (2008); See also *U.S. v. Barton*, 633 F.3d 168 (3rd Cir. 2011)(At the core of the Second Amendment is the right of law-abiding, responsible citizens to use arms, in defense of hearth and home); *Howerton v. United States*, 964 A.2d 1282 (D.C. 2009)(Second Amendment protects bearing arms for a lawful purpose by law-abiding responsible citizens in defense of hearth and home); *State v. Sieyes*, 225 P.3d 995 (Wash. 2010)(The Second Amendment protects an individual right to bear arms from state interference through the due process clause of the Fourteenth Amendment); *State v. Knight*, 241 P.3d 120 (Kan. Ct. App. 2010)(The right to "keep and bear arms" embodied in the Second Amendment applies not only to the federal government, but also to the individual states); *People v. Zerillo*, 219 Mich. 635 (1922)(Defendant, an unnaturalized citizen, was convicted of possessing a revolver without a sheriff's permit, contrary to Public Acts 1921; the conviction was set aside and defendant discharged. "Firearms serve the people of this country a useful purpose wholly aside from hunting.." The provision in the Constitution granting the right to all persons to bear arms is a limitation upon the power of the Legislature to enact any law to the contrary. The exercise of a right guaranteed by the Constitution cannot be made subject to the will of the sheriff. The part of the act under which prosecution was planted is not one of regulation, but is one of prohibition and confiscation). "While the legislature has power, in the most comprehensive manner, to regulate the carrying and use of firearms, it has no power to make it a crime for any person, alien or citizen, to possess firearms for the legitimate defense of self or property." 3 Gillespie Mich. Crim. L. & Proc. § 80:1 (April 2011).

STRICT SCRUTINY

Before analyzing Massachusetts's firearm licensing scheme and statutes This Court must determine the appropriate level of scrutiny to apply. Under two-prong approach to Second Amendment challenges, a court first asks whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee, and if it does, the court evaluates the law under some form of means-ends scrutiny, and if the law passes muster under that standard, it is constitutional, but if it fails, it is invalid. U.S.C.A. Const. Amend 2; *U.S. v. Marzzarella*, 614 F.3d 85 (3rd Cir. 2010); *Osterweil v. Bartlett*, 819 F.Supp.2d 72(N.D.N.Y. 2011)(*Heller* "appears to suggest that the core purpose of the right conferred by the Second Amendment was to allow 'law-abiding, responsible citizens to use arms in defense of hearth and home'"); *U.S. v. Masciandaro*, 638 F.3d 458,470 (4th Cir. 2011)(strict scrutiny is reserved for "any law that would burden the fundamental, core right of self-defense in the home by a law abiding citizen); See generally Richard H. Fallon, Jr., Strict Judicial Scrutiny, 54 UCLA L. REV. 1267, 1271 (2007) ("the Supreme Court adopted the strict scrutiny formula as its generic test for the protection of fundamental rights").

The trend among federal courts is to look to the First Amendment in seeking interpretive guidelines for the Second. "We agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment." *United States v. Chester*, 628 F.3d 673, 682 (4th Cir 2010).

> Because *Heller* is the first Supreme Court case addressing the scope of the individual right to bear arms, we look to other constitutional areas for guidance in evaluating Second Amendment challenges. We think the First Amendment is the natural choice. *Heller* itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment.

> We think this implies the structure of First Amendment doctrine should inform our analysis of the Second Amendment.

*United States v. Marzzarella*, at 89 n.4. The analogies between these two amendments are unsurprising: the First and Second Amendments are the only provisions of the Bill of Rights that secure some substantive individual conduct---speech, worship, the keeping and bearing of arms against government infringement. See also *Heller* at 2797("It has always been widely understood that the Second Amendment, like the First and Fourth Amendment codified a pre-existing right."). Indeed, concerns regarding the abuse of First and Second Amendment protected activities have long been viewed as similar. *See Commonwealth v. Blanding*, 20 Mass. 304, 314 (1825)("The liberty of the press was to be unrestrained, but he who used it was to be responsible in case of its abuse; like the right to keep arms, which does not protect him who uses them for annoyance or destruction."); *Respublica v. Oswald*, 1 U.S. (1 Dall.) 319, 330 n.* (Pa. 1788)("The right of publication, like every other right, has its natural and necessary boundary; for, though the law allows a man the free use of his arm, or the possession of a weapon, yet it does not authorize him to plunge a dagger in the breast of an inoffensive neighbour."); *Commonwealth v. Sefranka,* 414 N.E.2d 602 (Mass. 1980)(When statute is capable of affecting First Amendment interests, vagueness doctrine demands even greater precision than in other contexts. U.S.C.A. Const. Amends. 1, 14).
In *United States v. Booker,* 570 F.Supp.2d 161, the defendant brought motion to reconsider the denial of his motion to dismiss his grand jury indictment for two counts of possession of firearm by person convicted of misdemeanor crime of domestic violence. (D.Me. 2008). The court in discussing the appropriate level of scrutiny noted that it is generally reserved for statutory restrictions that affect the exercise of certain "fundamental rights." *Id.* at 163 citing *Kadrmas v. Dickinson Pub. Sch.,* 487 U.S. 450, 458, 108 S.Ct. 2481, 101 L.Ed.2d

399 (1988). The court acknowledged that the individual right to bear arms might well be fundamental right, which requires strict scrutiny. *Id.* Supporting this conclusion by the placement of the Second Amendment within the Bill of Rights alongside this Country's most precious freedoms. See *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973)(noting that education, of course, is not among the rights afforded explicit protection under our Federal Constitution). See also *Miller v. LeVerkin City,* 528 F.3d 762, 771 (10th Cir. 2008)("If a fundamental right were at stake, only heightened scrutiny would have been appropriate."); *Save Palisade Fruitlands v. Todd*, 279 F.3d 1204, 1210 (10 Cir. 2002)("We will...apply strict scrutiny if the state's classification burdens the exercise of a fundamental right guaranteed by the U.S. Constitution.").

In *Commonwealth v. Alvin Love*, the defendant on appeal challenged the validity of the bail jumping statue on which he was convicted. Upon the defendant's facial challenge the court responded by stating:

> By a settled rule in the Commonwealth, however, *so broad a contention, which asks the court to consider all situations to which the statute might be applied, and to void it if any of the applications would be unconstitutional, is reserved for cases where the statute appears to trench on First Amendment (or similar) rights.*

530 N.E.2d 176, 179 (Mass. App. Ct. 1988)(emphasis added by author). See also *Opinion of the Justices to House of Representatives,* 393 N.E.2d 313 (Mass. 1979)(Where uncertainty engendered by a criminal statute threatens to restrain the exercise of constitutionally protected rights, judicial relief is particularly appropriate); *Doris v. Police Com'r of Boston*, 373 N.E.2d 944 (Mass. 1978)(Constitutional 'vagueness' doctrine is pertinent to criminal statutes or statutes that improperly burden or chill fundamental rights); *Opinion of the Justices,* 229 N.E.2d 263 (Mass. 1967)(Vice of unconstitutional vagueness

is aggravated where statute in question operates to inhibit exercise of individual freedoms affirmatively protected by Constitution). "Rules that grant licensing officials undue discretion are not constitutional." *Berger v. City of Seattle*, 569 F.3d 1029, 1042 n.9 (9th Cir. 2009).

> It is settled by a long line of recent decisions of this Court that an ordinance which....makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official as by requiring a permit or license which may be granted or withheld in the discretion of such official is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.

*Staub v. City of Baxley*, 355 U.S. 313, 322 (1958). See also *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969). "While prior restraints are not unconstitutional per se, any system of prior restraint comes to the courts bearing heavy presumption against its constitutional validity." *Clark v. City of Lakewood*, 259 F.3d 996, 1005 (9th Cir. 2001). In, *Staub*, the Supreme Court struck down an ordinance authorizing a mayor and city council 'uncontrolled discretion,' to grant or refuse a permit required for soliciting memberships in organizations.

The court held that such a permit:

> makes enjoyment of speech contingent upon the will of the Mayor and Council of the City, although that fundamental right is made free from congressional abridgement by the First Amendment and is protected by the Fourteenth from invasion by state action. For these reasons, the ordinance, on its face, imposes an unconstitutional prior restraint upon the enjoyment of First Amendment freedoms and lays "a forbidden burden upon the exercise of liberty protected by the Constitution.

*Staub*, 355 U.S. at 325, quoting *Cantwell v. Connecticut*, 310 U.S. 296, 307 (1940). "Traditionally, unconstitutional prior restraints are found in the context of judicial injunctions or a licensing scheme that places 'unbridled discretion in the hands of a government official or agency." *Nat'l Fed'n of the Blind v. FTC*, 420 F.3d 331, 350 n. 8

(4th Cir. 2005) "Unbridled discretion naturally exists when a licensing scheme does not impose adequate standards to guide the licensor's discretion." *Chesapeake B & M, Inc. v. Harford County*, 58 F.3d 1005, 1009 (4th Cir 1995). Standards governing prior restraints must be "narrow, objective and definite." *Shuttlesworth,* 394 U.S. at 151. Standards involving "appraisal of facts, the exercise of judgment, or the formation of an opinion" are unacceptable. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992). Public safety is invoked to justify most laws. Just as the gun licensing scheme in the instant case operates under Massachusetts's Executive Office of Public Safety. The 'discretionary' licensing scheme in place in Massachusetts is held in the hands of the local police chief to issue licenses or permits for firearms. Yet, the will of the local police chief to decide who may exercise their fundamental right to own a firearm cannot be seriously considered a fundamental right if a local city officer decides who can and cannot own a firearm or who has or does not have this right. Where a fundamental right is concerned, the mere incantation of a public safety rationale does not save arbitrary licensing schemes, and certainly here Massachusetts's firearm licensing scheme inhibits the exercise of the fundamental right of bearing arms. The right to carry a firearm for self-defense is plainly among the "freedoms which the Constitution guarantees." *Staub, 355* U.S. at 322. The government thus bears the burden of proving that an applicant may not have a permit, for a constitutionally compelling reason defined by standards that are "narrow, objective and definite." *Shuttlesworth*, 394 U.S. at 151. Even less defensible is the requirement of 'good moral character." The Supreme Court long ago rejected the constitutionality of an ordinance demanding "good character" as a prerequisite for a canvassing license. *Schneider v. New Jersey (Town of Irvington)*, 308 U.S. 147, 158 (1939). In *Robert*

*Goldstein v. Town of Nantucket*, 477 F.Supp. 606 (1979) a professional musician alleged that enforcement by town of its transient vendor bylaw deprived him of rights secured by the First Amendment. The court found the law to be unconstitutional citing *Shuttlesworth*, 394 U.S. at 153 and thirty years of prior First Amendment decisions and concluded "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Id.* at 150-1. Nantucket's entertainer by law requires a permit and a permit may not issue without a finding by the Board of Selectmen that issuance would be beneficial to the best interests of the Town of Nantucket and its inhabitants. *Goldstein* at 608. In making its determination for issuance of a permit the board is required to consider the financial responsibility of the entertainer, the effect of the entertainment on the neighborhood properties, the interests of public order and safety and as matter of practice they also took into consideration the wishes of the merchants in shopping area. *Id.* at 609. Because three of the licensing criteria were not narrow, objective nor definite standards and because those criteria exceed their scope on constitutionally permissible grounds for regulating free expression, the bylaw did not pass constitutional muster and is unconstitutional as applied to Goldstein. *Id.* See also *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (substantive due process doctrine "forbids the government to infringe fundamental liberty interests . . . unless the infringement is narrowly tailored to serve a compelling state interest")

The issue in the present case is whether the Commonwealth may bar individuals from exercising the right to privately own and keep arms at all by use of permitting scheme. This comes literally within the definition of a prior restraint. After all, the right to carry

firearms is a "freedom which the Constitution guarantees," and "an ordinance which…makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official" is "an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *Staub*, 355 U.S. at 322. The time to apply means-ends scrutiny is when a court is presented with an objective licensing standard. A court can evaluate objective standards by examining their purpose and impact under whichever means-end rubric should applied. But it is difficult to tell exactly what public interest is being served by a policy of unbridled discretion. Since the activity being regulated is the exercise of a fundamental right, its general suppression cannot be in the public interest. The idea of an official or the local police chief dispensing permission to exercise a "right" is inherently incongruent with the concept of rights. See *Heller*, at 2821("a constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all). The prior restraint doctrine has been almost entirely developed within the First Amendment indicates that it is especially suitable for application in the Second Amendment context. David G. Browne insists that the Second Amendment should be analyzed and interpreted through the framework that the First Amendment implies, and as such should be determined to be an individual right, guaranteed to the same "the people" that the First Amendment protects. *Treating the Pen and the Sword as Constitutional Equals: How and Why the Supreme Court Should Apply Its First Amendment Expertise to the Great Second Amendment Debate,* 44 Wm. & Mary L. Rev. 2287 (2003).

In conclusion, John Cassidy's IN HOME possession of firearms warrants strict scrutiny analysis and thus Massachusetts's gun licensing scheme fails to pass constitutional muster. Accordinly, all convictions against this Plaintiff be withdrawn, and John should be immediately released from state jail.

**IV. ARTICLE 17 OF THE DECLARATION OF RIGHTS IN THE MASSACHUSETTS'S CONSTITUTION CONFERS AN INDIVIDUAL RIGHT TO KEEP AND BEAR ARMS AND THE CURRENT INTERPRETATION OF A COLLECTIVE RIGHT IS INCORRECT, HISTORICALLY INACCURATE AND A BROAD DEVIATION FROM THE WRITERS' ORIGINAL INTENT**

Article 17 of Declaration of Rights reads as follows:

> The people have a right to keep and to bear arms for the common defence. And as, in times of peace, armies are dangerous to liberty, they ought not to be maintained without the consent of the legislature; and the military power shall always be held in an exact subordination to the civil authority, and be governed by it.

The Supreme Judicial Court of Massachusetts has held that Mass. Const. art XVII does not guarantee individual ownership or possession of weapons. Commonwealth v. Depina, 922 N.E. 2d 778(2010); Commonwealth v. Davis, 343 N.E.2d 847, 849(1976). In Depina, the court rejected defendant's challenge to a statute prohibiting carrying of a firearm in public without a license. In Davis, the court rejected the defendant's challenge to a state law prohibiting the possession of a short-barreled shotgun. Id. at 850-51. In both cases, the court reasoned that Mass. Const. art. 17 was intended to provide for the common defence and does not guarantee an individual right to keep and bear arms. According to the court, each statute was "part of a large regulatory scheme to promote the public safety, and there is nothing to suggest that, even in early times, due regulation of possession or carrying of firearms, short of some sweeping prohibition, would have been thought to be an improper curtailment of individual liberty or to undercut the militia system." Depina at 790; Davis at 849. See also Commonwealth v. Murphy, 44 N.E. 138,138 (1896)(rejecting a Mass. Const. art. 17 challenge to a statute forbidding private militias, observing that "it has been almost univerally held that the legislature may regulate and limit the mode of carrying arms."). In

Chief of Polce of Shelburne v. Moyer, 453 N.E.2d 461, 464(Mass. App. Ct. 1983), The Massachusetts Court of Appeals concluded, consistent with Davis, that a statute requiring a person to have a license in order to carry a firearm did not violate Mass. Const. art 17 because "there is no right under art. 17... ..for a private citizen to keep and bear arms and thus to require that a citizen have a license to do so is no unconstitutional." Accord Dupont v. Chief of Police of Pepperell, 786 N.E.2d 396, 400(Mass. App.Ct. 2003). The aforementioned cases are currently valid interpretations of art. 17. However politically motivated or historically inaccurate they may be. 'Commen Defence' as used in art. 17 does NOT confer a collective right to own firearms in some sort of militia service. Common Defence as used in art. 17 is intended by its drafters to give Massachusetts's citizens the right to privately own firearms. If its purpose was to allow for carrying them abou freely or its 'carrying' purpose, that can be further discussed at a later time, however, it cannot be doubted private ownership and possession of firearms is exactly what the authors of Massachusetts's Constitution intended to be given to its citizens. See Heller at 2821("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or no future legislatures or (yes) even future judges think that scope too broad."

The Preamble to the Massachusetts's Constitution reads:

> The end of the institution, maintenance, and administration of government, is to secure the existence of the body politic, to protect it, and to furnish the individuals who compose it with the power of enjoying in safety and tranquility their natural rights, and the blessings of life: and whenever these great objects are not obtained the people have a right to alter the government, and to take measures necessary for their safety, prosperity and hapiness.
>
> The body politic is formed by a voluntary association of individuals: it is a social compact, by which the whole people covenants with each citizens and each citizen with the whole people, that all shall be governed by certain laws for the common good. It is the duty of the people, therefore, in framing a constitution of government, to provide for an equitable mode of making laws, as well as for an impartial interpretation, and a faithful execution of them; that every man may, at all times, find his security in them.

> We, therefore, the people of Massachusetts, acknowledging with grateful hearts, the goodness of the great Legislator of the universe, in affording us, in the course of His providence, an opportunity, deliberately and peaceably, withoutfraud, violence or surprise, of entering into an original, explicit, and solemn compact with each other; and of forming a new constitution of civil government, **for ourselves** and posterity; and devoutly imploring His direction in so interesting a design, do agree upon ordain and establish the following Declaration of Rights, and Frame of Government, as the Constitution of The Commonwealth of Massachusetts.

(emphasis added by author). The Preamble calls for enjoying the individuals' natural rights and a paragraph later states impartial interpretation and faithful execution of laws, it is time art. 17 is given its true and intended meaning: individual right to privately own and possess firearms.

Both U.S. Supreme Court Decisions, Heller and McDonald, contain an extensive historical background on the Second Amendment. Thus the need to fully develop any historical facts/background regarding early firearm ownership, militias and or militia service is not necessary or can be further reviewed when necessary. In Heller, the U.S. Supreme Court came to the same historical discovery of INDIVIDUAL right guarantee(as applied and referencing Massachusetts's and three other states' constitutions) See Commonwealth v. Blanding, ante, for Massachusetts's case. "We therefore believe that the most likely reading of all four of these pre-Second Amendment state constitutional provision is that they secured an INDIVIDUAL right to bear arms for defensive purposes." Heller at 2803. Two years after the Heller decision this Commonwealth acknowledged and addressed the Supreme Court's above assertion of art.17 securing an individual right to bear arms in Depina, stating that, "nothing in the Supreme Court's opinion in Heller causes us to question Justice Kaplan's learned interpretation of art. 17 in Commonwealth v. Davis." Depina at 790. Yet, this Plaintiff has questioned the precise meaning of art. 17, the words 'common deffence,' and Massachusetts's gun licensing scheme. Massachusetts's registration and licensing scheme is nothing more than a tax on firearm ownership, in essence an excise tax on a fundamental right. A tax on citizens' exercising their natural right.

The firearm licensing scheme in Massachusetts is a multi-leveled licensing scheme in which one must pay a fee and be given permission each time he or she wishes to obtain a permit to purchase, permit to possess, license to carry, or license to sell firearms. This multi-level licensing scheme has resulted in lowering gun ownership in Massachusetts since 1998 and placing an excise tax on firearm ownership. It can hardly be argued against that Massachusetts's licensing scheme is based upon the 1934 National Firearms Act and the Assault Weapon Ban in the early 90s. The Commonwealth's varying definitions of firearms and related devices are identical to the act and ban and even specifically reference the NFA of 1934 in the statutes. Factually, the NFA's purpose was to place an excise tax on 'gangster' style weapons and to require fee and registrations for ownership and transferring of said weapons. Originally NFA was to include handguns and pistols, however this never was incorporated and the federal government still taxes these 'gangster' style weapons today and issues federal firearms licenses to those deadling in such arms. Moreover, the federal government requires a Special Occupational Tax (SOT) to be a dealer or importer of such arms, much the same as Massachusetts's requires additional fees and licenses to be licensed under state law as a dealer of any arms. In essence, this Commonwealth has taken the federal government's tax plan and registration requirements for regulating 'gangster' style weapons and put it in place on a state revenue level in order to regulate all firearms(handguns, rifles, shotguns, pistols) under the guise 'of public safety/police powers.' Numerous taxes on the exercise of a fundamental right, imposing felony convictions for not having paid the taxes and having proper STATE license and restricting gun ownership in the Commonwealth is not only unacceptable, it is not at all consistent with the original intent of the drafters of the Massachusetts's Constitution.

In 1976, along with the Davis case ruling which held no private right to firearm ownership is given in art. 17,there was another equally important case: Commonwealth v. Jackson, supra. This case dealth with a similar issue of gun ownership but mainly with the new mandatory prison sentences for unlicensed gun ownership. Both Davis and Jackson case rulings were possibly

politically motivated and ruled in favor of restricting gun ownership in this state by a wrong interpretation of art. 17 and by the urging of Judge John Fox(Plaintiff notes that the restrictive gun laws overturned in Washington D.C. in Heller case where coincidently enacted in 1976). Mr. Fox's position ofstrictly regulating gun ownership in the Commonwealth and punishing all who did no seek a license is well known and well documented. He not only submitted an amicus curie brief in Jackson he is listed as 'pro se' on the case heading. The state legislature passed the Bartley-Fox, as it is known, in April 1975, with the intent that it be used in the prosecution of gun -related crimes. Mr. Fox's representation of white hats, brown hats, and black hats is quite far from what John and Samuel Adams had in mind when they began to draft and eventually write the Constitution of Massachusetts.

In 1977 Boston University Law Review embarked on a review of this newly imposed Bartley-Fox Law over the span of a few years, using Sufflok County for its data pool. See James A. Beha, And nobody can get you out: The impact of a mandatory prison sentence for the illegal carrying of a firearm on the use of firearms and on the administration of criminal justice in Boston, (1977). This article still remains one, if not the only, in depth review of this law which has failed in its scope, purpose, congested courts since its enactment, spent considerable amount of resources enforcing the failed law and highlights the arbitrary and capricious prosecution of firearm violations past and present. Fast forward to 1998, when the new licensing scheme, Gun Control Act of 1998, was enacted in the Commonwealth which created, for most part, what we all know to be in full force today regarding, FID cards, licenses to carry and so forth. The Act set a timeline for expiration of all FID cards. Every FID card in the state was set to expire either in 1999 or 2000, in order to roll out the newly established multi-level permit, license and registration laws regarding firearms. License to carry permits would convert into newly formed permits, with the appropriate level, and would expire on original said date. It required applicants to complete safety courses, firearms to be stored in certain ways, banned specific guns, and [illegible] established new category of 'large capacity weapons/feeding

devices.' The effect of this new law were devastating to legal gun owners and firearm licenses. It reduced firearm licenses by 86%. A report by the Criminal History Systems Board and Firearms Record Bureau admitted that 1,251,808 of the 1,541,201 licenses were now unaccounted for under the new system. An additional report released by the Massachusetts House Post Audit and Oversight Committee admitted it had failed to notify three quarters of a million gun owners of their expiring FID cards. Later in the report it notes that only five percent of FID cardholder's on file prior to the new act are currently licensed. CLearly, the movement towards less private ownership of guns in Massachussetts and taxing those private citizens wishing to legally own them is happening. While exemptions from the new laws and registration requirements for state employees and police officers is abundantely allowed. Is this truly happening or is this a merely a biased monologue vying for more guns or revocation of criminal convictions against John Cassidy?

One does not have to drive far or long in this Commonwealth to get the notion that Massachusetts is the "Spirit of America." After all, it is written on the license plates of most every car registered in the Commonwealth. With one of the oldest Constitutions on the books and an epicenter for American history the state is ripe with revolutionary history and ties to American patriotism. Yet, is it possible that the past fifty to sixty years Massachusetts has failed to sing its own song? Anyone who has taken a civics class or history on the American Revolution knows that the British attempts to tax and disarm the colonies were a large part of the outbreak of the revolution. In 1774, British regulars emptied a militia powder magazine in Massachusetts, some complaining this was an attempt to disarm the people while others spread incorrect report that six colonists had been killed during the raid, which caused 60,000 armed men from western Massachusetts to march to meet the British regulars, which was a force seven times the size of entire British army stationed in the colonies. See S. Patterson, Political Parties in Revolutionary Massachusetts, 103(1973). Which lead to colonists forming 'minutemen' and a movement to upgrade militia arms and organization spread rapidly, Patrick Henry's "give me liberty or give me death" speech was directed at this movement.

H.Miles, Republication of the Principles and Acts of the Revolution in America, 278(1876). Former Lieutenant Governor of Massachusetts Samuel Adams and the Committee of COrrespondence only furthered this spread of a newly found and desired independence by spreading propaganda and information through letters during the revolution or what can also be considered speech or press.

On February 7, 1788 Massachusetts ratified the United States Constitution and during the convention Lt. Governor Samual Adams proposed the following amendments:

> And that the said Constitution be never construed to infringe the just liberty of the press, or rights of conscience; or to prevent the people of the United States, who are peaceable citizens, from keeping their own arms; or to raise standing armies, unless when necessary for the defense of the United States or of some one or moe of them; or to prevent the people from petitioning, in a peaceable and orderly manner, the federal legislature, for a redress of grievances; or to subject the people to unreasonable searches and seizures of their perons, parpers or possessions.

Debates of the Massachusetts Convention of 1788, 86-87, 266 (Boston,1856). At the close of the revolution, the former colonies national government operated under the Articles of Confederation. These provided for only narrow powers at the national level, and reserved powers and duties to the individual states. The pre-1787 American guarantees of rights are accordingly, to be found in the state bill of rights drafted during this period. Not all states then adopted constitution, let alone bill of rights; many were content to rely upon colonial charters. But the prominence given to the right to arms in those popular ratified bills illustraties the importance attached to this right. The recognition of this right in states' bill of rights has a second importance, it has been claimed that the Second Amendment's choice of words, right 'of the people' indicates a desire to protect the states against federal infringement of their right to possess an organized militia, a 'collective' right, not individuals in their rights to own arms. See Comment, Constitutional Limitations on Firearm Regulations, Duke L.J. 773, 796-97 (1969). This inclusion of parallel guarantees in states' bill of rights entirely refutes this view.

There was at this time no federal government, these state bills of rights were intended, not to grant power to state governments, but to reserve individual rights from among the grants of state powers. The sole non-state political unit then existing, in whose favor such a reservation could run, was the individual.

In June 1776 Virginia's declaration of rights was first, with both Thomas Jefferson and George Mason writing documents, yet Virginia's Convention opted for Mason's. Next Pennsylvania in July 1776. North Carolina's right to bear arms for the 'defense of state' were in contrast to Pennsylvania and Vermont's approaches. 6 F. Thorpe, The Federal and State Constitutions, 3814 note 177(1901). The contrast may not have been intentional Massachusetts also recognized among the "natural, esseential and unalienable rights of all free men, the right of enjoying and defending their lives and liberties." 3 F. Thorpe at 1889; See Don B. Kates Jr., Handgun Prohibition and the Original Meaning of the Second Amendment, 82 Mich. L. Rev. 204, 244(1983) (19-century courts enver read 'common defence' to limit the use of weapons to militia service); See also Andrews v. States 50 Tenn. 165, 196(1871)(Constitution of Tennessee contains a similar wording in its right to bear arms clause and uses the words 'for their common defense.' In his concurring opinion, written seperately, Judge Nelson noted the following: The words "in defense of themselves and the state," are equivalent to the words, "for their common defense..")(Nelson, J concurring opinion)(See additionally p201 notes from Thomas Page v. The State, "common defense")

Most importantly and persuasively, when asking This Court to consider such an idea regarding art. 17 of Massachusetts's Constitution actually establishing an indiviual right to own firearms is that one of Massachusetts's town meetings did go on the record that "we deem it essential privilege to keep arms in our house for our own defense" and complained that the common defence qualified might someday be read to allow the government to "confine all firearms to some public magzine and thereby deprive the people of the benefit of the use of them." The Popular Sources of Poliical Authority and documents of the Massachusetts Convention of 1780, at 624 (U and M Hardlin ed.1966)

See also Stephen P. Halbrook, That Every Man be Armed, 64-65 (Oakland, CA, The Independent Institute 1984)(The Clause, "for the common defnese," had significant dissenters in North Hampton, MA. They requrest a less restrictive wording to this provison of 1780 Constitution, "The people have a right to keep and bear arms as well for their own as the common defence." Williamsburg, MA also made similar objections). These concerns may have contributed to the rejection of the 'common defense' and 'defense of state' qualifiers in subsequent state bill of rights and ultimately in the federal second amendment. A right to bear or keep and bear arms for defense of self was recognized in Kentucky in 1792, Indiana in 1816, Connecticut in 1818 and Missouri in 1820. F. Thorpe, note 177 at 538, 1059, 1275, 2161. The Senate rejected a propsal to add 'for the common defnse' to what became the Federal Second Amendment. Massachusetts's choice of qualifier of 'for the common defense' in their state bill of rights could have likely been referring to the Journal of House Commons from December 26, 1688 to October 26, 1693 and the guarantee by the House of the Lords for their subjects to 'keep arms and for their common defense' being used to secure individual right to weapons and to restore the seized arms back to the orginal owners.

John Adams is credited with drafting the right to bear arms clause of Massachusetts's Constitution and is also credited with drafting majority of the Constitution in general. John Adams's other writings on the subject of arms are in favor of private ownership of firearms, he took this same poistion while he was a lawyer in The Boston Massacre Trial. Historically it is an unsupported interpretation he decided to depart from this position in writing art. 17. Lastly, as the cousin of Sam Adams who was also supporter of the right to bear arms by private citizens it can hardly be considered John Adams wrote art. 17 with the intention of establishing a collective right to bear arms in some sort of militia or other fashion, his intent is that all citizens have a right to own firearms and refers to defense of the people against a tyrannical government. Which is exactly what his fellow colleagues Patrick Henry, James Madison, George Washington, Samual Adams, and Thomas Jefferson all believed in

the right to keep them, with all that is implied fairly as an

incident to this right, a private right, guaranteed to the citizen, not the solider.

When the court in Davis considered art. 17 and the right to bear arms it states:

> The meaning of such provisions is to be gathered from their history which is reasonably well known and need not be reviewed here in detail...The colonists distrusted standing armies and preferred to look to a militia.. ."civilians primarily, solders on occasion" for protection Article 17 expresses the distrust in its second sentence. It refers to the preference in the first: the declared right to keep and bear arms is that of the people, the aggregate of citizens; the right is related to the common defense; and that in turn points to service in a broadly based, militia. Provisions lke art.17 were not directed to guaranteeing individual ownership or possession of weapons...

Davis at 887-88(in text citations and string cites remoed by author). The last sentence in the above quotation referencing 'provisions like art. 17,' is followed by citing two cases, Salina v. Blaksley, 72 Kan. 230(1905) and Burton v. Sills, 53 N.J. 86(1968). Davis at 888. This Plaintiff's analysis of the direct quote above, it would appear that the issue of art. 17 confering an individual o rcollective right to bear arms will rely on (1) historical background when it was written and (2) these two cases. In one instance in analyzing the history of The Second Amendemnt in Heller, the Supreme Court cities a law review article written by Don B., Kates, supra. In this law review article Mr. Kates specifically addresses the Kansas

Supreme Court case of *Salina.* See Kates, *supra* at n. 31 p. 211 and n.171 p. 244-45. He notes that the collective theory is sometimes viewed as an early example of state's right approach. However, he notes that it is difficult to believe that the Kansas Supreme Court (in *Salina)* meant to suggest that its constitution's right to arms guarantee was intended to protect the state's own right to possess arms. Such an interpretation reduces the state constitutional guarantee to nonsense, construing it as if it read: "the state shall not infringe the state's right to keep arms or have its militia bear them." *Id.* n. 171 p.244-245. See also *Heller at 2803 citing Commonwealth v. Blanding,* 20 Mass. 304, 313-314("The liberty of the press was to be unrestrained, but he who used it was to be responsible in cases of its abuse; like the right to keep fire arms, which does not protect him who uses them for annoyance or destruction."). Moving further into the *Davis* opinion, a few sentences later, the court points out that a law interfering with the right to own arms could limit the effectiveness of the militia and thus offend the art. 17 right, but that this issue no longer exists because of the modern day militia being the National Guard and it is supported by public funds. *Id.* at 888. Yet, under the current system National Guards have dual status as members of both the state and federal guard. 10 U.S.C. s 311 (1988). The National Guard is armed, paid and trained by the federal government and the Guard cannot resist being 'called out' to service by the federal government even if resisted by the states. 10 U.S.C. s 101 (10)(C) and s 332 (1988). The National Guard is subjected to federal military discipline, the same way the government's armed forces are, they are required to swear an allegiance to both U.S. and the state governments. 10 U.S.C. s 802 (a)(3) and s 304 (1988). In William S. Fields and David T. Hardy's *The Militia and the Constitution: A Legal History* the authors quote a military officer as saying:

> By providing for a militia in the Constitution, the Framers sought to strengthen civilian control of the military. They postulated that a militia composed of citizen-soliders would curb any unseemly ambitions of the small standing army. Today's National Guard is often perceived as the successor to the militia, and observers still tout the Guard's role as the ultimate restrainst on professional military. The reality, however, is much different. Today's National Guard is very different forice from the colonial-era militia. With 178,000 full-time federal employees and almost all of its budget drawn from federal government, the National Guard is, for all practical purposes, a federal force. Indeed, one commentator concluded that it is very much akin to the "standing army" against which the Founding fathers railed.

136 Mil. L. Rev. 1, 2 (1992) citing The Second Amendment and the States' Right: A though Experiment, Glenn Harlan Reynolds and Don B. Kates, 36 Wm. & Mary L. Rev. 1737-1768(1995) In conclusion, the entire analysis from the Davis Court seems to be inaccurate and in essence bad law and a bad interpretation of art 17 in that the court ruled no individual right to possess firearms. When in fact the writers of art. 17 absolutely intended to confer a private right to possess and own firearms, this conclusion being based upon their intent, historical background of the words used and historical record regarding the writers' belief. For the above mentioned reasons, the firearms convictions against John Cassidy MUST be removd as he has an individual right to possess private firearms in his home by virtue of art. 17 of the Massachusetts Constitution. Further incarceration for possessing these firearms violates art. 17.

**CONCLUSION**

Based on the above information contained in subsections I, II, III, and IV the Plaintiff humbly requests that all convictions regarding his in home possession of firearms be overturned. Further incarceration violates his due process rights, civil rights and the convictions violate this Plaintiff's right to keep and bear arms as guaranteed to him by the Second Amendment to the U.S. Constitutionand by art. 17 of the Massachusetts's Constitution.

Recent Massachusett's cases dealing with firearms such as McGowan, 464 Mass. 232(2013), Powell, 459 Mass. 572(2011), Heng, 80 Mass. App. Ct. 1101(2011), Runyan, 456 Mass. 230(2010), and

Loadholt, 456 Mass. 411(2010) and possibly additional cases not listed here all deal with or attempt to deal with firearm offenses and prosecution. The courts in these cases attempt to interpret the recent Supreme Court ruling in Heller and McDonald. The amount of guidance set out in both Supreme Court decisions in some aspects in minimal and this Commonwealth is joined by many states in attempting to ensure their own state laws are in accordance with federal law. Yet, it appears that most recent firearm cases in this state have been most unwilling to apply wit with any great weight the right to keep and bear arms as secured to American citizens. In fact, most of the recent Massachusetts firearm cases taking up the issue unfortunately deal simultaneously with repeat offenders, extremely violent robbery, homicide cases, gang shootings or activities, and/or drug cases. These factors have not allowed This Commonwealth's courts to be able to impartially review the state's licensing scheme and have lead to the courts' inability to create 'good' firearm case law post McDonald and Heller. Specifically, it appears there is not a single case in Massachusetts that deals with in home possession of weapons or large capacity devices that were obtained legally. Yes, there are cases that deal with in home possession of weapons that were either stored incorrectly, the firearm had obliterated serial numbers, firearm was used in an already illegal act or that the gun was never legally ownded, that is purchased and owned well within the law's allowances. The case at bar regarding John Cassidy represents exactly that. In home possession of two firearms that were purchased under proper state and federal laws. Owned in perefect innocent and this Plaintiff is convicted and jailed by this state via an array of felony charges. The totality of the circumstances surrounding this new Massachusetts's resident's arrest and prosecution for owning cannot be further from reasonable or justice.. It is for these reasons his convictions must be overturned.

If this Commonwealth's laws do pass constitutional muster, which they don't, and these rescrictive gun laws are found 'reasonable,' this young man wonders just what the Commonwealth considers to be 'unreasonable.' Given the fact that a new resident can now find himself now a convicted felon and in state

jail. for in home possession of firearms lawfully purchased and legally owned. Had the Commonwealth allowed him to apply and pay the taxes associated with the ownership and application, the laws might be found 'reasonable regulation,' notwithstanding the Commonwealth failed to prove 'knowingly' possession and that art. 17 confers an individual right not a collective right. Instead this state simply confiscated the arms, indicted the citizen and four years later convicted him of seven felony gun possession charges. Sentencing him to mandaotry state jail time. Denying him his liberty, denying him his chosen career path and virtually bankrupting him or pushing Mr. Cassidy into debt all along the way under the guise of'reasonable regulation.' Notwithstanding the collateral damages suffered and inflicted for four years and the current abuse and pschological stress and damage associated with being a state inmate.

Respectfully Submitted,

6/25/15

John Cassidy, W106065

CERTIFICATE OF SERVICE

I, John Cassidy, pro se Plaintiff hereby certify that on 25 of June, 2015 did servece a copy of (1)Plaintiff's Complaint, (2)ex parte motion for pre-liminary injunction, (3) motion for service by first class mail and aff'd of indigency, (4)motion for summary judgment, (5)statement of material facts for Plaintiff's motion for summary judgment, (5)memorandum in support of Plaintiff's motion for summary judgment, and (6)Plaintiff's verified complaint in support of pre-liminary injunction.at the following address:

Attorney General of Massachusetts, Maura Healey
Office of Attorney General
McCormack Bldg.
1 Ashburton Place
Boston, Ma 02108

All statements and laws contained herewith and filed simultaneously within PLaintiff's suit are known to be truth via personal knowledge and submitted as such in a valid, earnest manor; accepting the pains and penalties of perjury or contempt.

Respectfully submitted,

6/25/15

John Cassidy w#106065
O.C.C.C.
1 Adminitration Rd
Bridgewater, MA 02324